Filed 10/6/16; pub. order 10/25/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BRENT DALE PIERSON et al.,<br><br>    Plaintiffs and Appellants,<br><br>  v.<br><br>HELMERICH & PAYNE INTERNATIONAL DRILLING CO.,<br><br>    Defendant and Respondent;<br><br>TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,<br><br>    Intervener and Respondent. | F070379<br><br>(Super. Ct. No. S-1500-CV-275575)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Sidney P. Chapin, Judge.

The Law Offices of Young Wooldridge, Scott D. Howry; Shernoff Bidart Echeverria Bentley, Michael J. Bidart, Ricardo Echeverria, Danica Dougherty; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiffs and Appellants.

Cogswell Nakazawa & Chang, Forrest R. Cogswell and Dena S. Aghabeg for Defendant and Respondent.

No appearance for Intervener and Respondent.

-ooOoo-

This appeal presents a question of employer liability under the doctrine of respondeat superior for a traffic accident caused by an oil rig worker driving home after work and providing two other employees with a ride to their employer-paid hotel. Under the going and coming rule, employees traveling to and from work are considered outside the scope of employment and, therefore, employers are not liable for torts committed during the employee's commute. The going and coming rule, however, is subject to many exceptions and plaintiff argues that the employee who caused the traffic accident fell within the special errand exception or the required-vehicle exception.

The question whether to apply the going and coming rule or an exception was presented to the trial court by the employer's motion for summary judgment and the plaintiff's motion for summary adjudication. The trial court granted the employer's motion based on the facts that (1) the employees were responsible for arranging and paying for transportation from the employer-provided hotel to the jobsite, (2) the employer did not require employees to carpool or rideshare, and (3) the employer did not derive an incidental benefit[1] from the ridesharing arrangements of its employees.

We conclude that the undisputed facts establish that the going and coming rule applies in this case. It cannot be reasonably inferred from the undisputed facts that the employer impliedly required or requested the driver to provide transportation to his supervisor between the hotel and the jobsite. The supervisor's requests for such rides were personal in nature and are not reasonably imputed to the employer. Therefore, this case is comparable with other cases in which the going and coming rule was applied to employees who made their own carpooling or ridesharing arrangements. (See *Anderson v. Pacific Gas & Electric Co.* (1993) 14 Cal.App.4th 254, 262 (*Anderson*) [employee-

---

[1] In this context, the term "incidental benefit" means a benefit is that "not common to commute trips by ordinary members of the work force." (*Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 962 (*Hinman*).) Thus, an employee who arrives at work on time does not provide the employer with an incidental benefit.

driver was not engaged in a special errand for employer because he was carpooling—i.e., taking another employee to a park-and-ride lot on his way home]; *Caldwell v. A.R.B., Inc.* (1986) 176 Cal.App.3d 1028, 1042 [no employer liability where carpooling was organized informally by individual workers] (*Caldwell*).) Consequently, the employer is not liable for the traffic accident under the doctrine of respondeat superior.

We therefore affirm the judgment.

## FACTS

Defendant Helmerich & Payne International Drilling Co. (H&P) is a Delaware corporation based in Tulsa, Oklahoma. H&P operates oil drilling rigs, including rigs located in south Kern County on an Occidental Petroleum (Oxy) leasehold.

*General Practices*

During the time relevant to this litigation, H&P operated drilling rigs 24 hours per day at the Oxy leasehold. Each rig had two crews working 12 hours per day for 14 days, followed by 14 days off. Shift changes occurred at 6:00 a.m. and 6:00 p.m. The 14-day period of work is called a "hitch."

H&P's scheduling of hitches and shifts makes it feasible for crew members to reside far from the drilling site. H&P also provides employees who live more than two hours away from the rig location with a shared room at a Best Western Heritage Inn located near the intersection of Interstate Highway 5 and Stockdale Highway. Employees make the hotel arrangements through H&P and can request a specific roommate if they wish. Typically, the employees assigned to a room work opposite shifts. H&P employees do not receive a bill for their stay at the hotel because H&P pays the bill directly. Employee spouses are not allowed to stay in the rooms provided by H&P.

Out-of-town employees who stay at the hotel are responsible for arranging and paying for their own transportation between their home and the hotel. For example, a crew member living in Kansas would arrange and pay for his travel to Bakersfield and for

3.

the transportation between the airport and the hotel. Similarly, employees are responsible for arranging and paying for their transportation to and from the hotel and jobsite.

Each oil rig is run by a crew of approximately five employees. Positions on the crew include a derrickhand, motorman, pithand, and floorhands. The "driller" acts as the foreman of the crew, supervises the other members, and ensures the rig is run as efficiently as possible. H&P's drillers are not involved in scheduling employees. Drillers are supervised by the rig manager, a position also known as a "toolpusher."

*Oil Rig 261 and Ridesharing*

One of the drilling rigs operated by H&P on the Oxy leasehold was called Oil Rig 261. The night shift crew for Oil Rig 261 included defendant Luis Mooney, a floorhand, and Mark Stewart, a motorman. Ruben Ibarra was the crew's driller and, therefore, the supervisor of Mooney, Stewart and other members of the crew. Ibarra and Stewart did not live in the area and stayed at the Best Western during their hitch.

Mooney lived in Bakersfield and provided Ibarra and Stewart with rides to and from the drill site in his personal vehicle, a Ford F250 pickup. Mooney testified that he had given Ibarra a ride at least 50 times. Ibarra testified that he believed he had ridden with Mooney a few dozen times before the accident. Mooney's route from his home to the jobsite took him by the hotel. As pointed out by plaintiff, Mooney's route changed when he gave rides because he would have to turn off of Stockdale Highway and into the parking lot of the hotel to pick up or drop off his passengers. This slight change in route is not relevant in this case. Mooney would have traveled by the accident site on his way to and from work regardless of whether he was providing crew members with a ride to or from the hotel.

*The Traffic Accident*

On December 12, 2011, after the end of their shift, Mooney was returning home and giving Ibarra and Stewart a ride to the hotel. Mooney also had driven Ibarra and Stewart to work the previous afternoon. At approximately 6:30 a.m., about 13 miles from

4.

Oil Rig 261, Mooney's pickup collided with a Chevrolet 2500 pickup driven by plaintiff Brent Pierson. The accident occurred about 0.7 miles east of State Route 33 in an unincorporated area of Kern County when Mooney crossed the double yellow line and into the lane of oncoming traffic at the Y intersection of Reserve Road and Skyline Road.

Both drivers were pinned in their vehicles and extracted by members of the Kern County Fire Department. Mooney sustained major injuries and was transported to Kern Medical Center by Hall Air Ambulance. Pierson, Ibarra, Stewart and the passenger in Pierson's vehicle were taken to Kern Medical Center by ambulance.

*Ibarra*

Ibarra lived in Pratt, Kansas and commuted to Bakersfield to work his hitch. When coming to California for work, Ibarra stayed at the Best Western provided by H&P. Ibarra arranged his own transportation between Kansas and California and between the airport and the hotel in Bakersfield. Sometimes Ibarra took a taxi cab from the airport to the hotel and sometimes an employee or one of his friends living in Bakersfield would pick him up and take him to the hotel. Ibarra traveled between work and the hotel by getting a ride from one of the other employees staying at the hotel or an employee who drives by it. When riding with Mooney, they sometimes would stop at a convenience store before work. On occasion, they stopped at the Penny Bar in McKittrick after a shift.

Prior to the accident, Ibarra had been provided with rides by the other crew members, Ilico Vasquez (derrickhand), Matt Falvella (pithand) and Rafael Gonzalez (floorhand). If Mooney had not provided Ibarra with a ride on the day of the accident, Ibarra would have asked the other members of the crew for a ride. If Ibarra was unable to obtain a ride from them, he would have arranged for alternate transportation.

No one at H&P advised Ibarra to seek a ride from other H&P employees. It was something Ibarra did to save the personal expense of a taxi ride to and from the airport or to and from the worksite.

*Stewart*

Stewart lived in Orcutt, California (Santa Barbara County) and was staying at the Best Western for his hitch in December 2011.  At the time, Stewart did not have a valid driver's license.  A valid driver's license was required to get through the gate onto the Oxy leasehold.  Consequently, Stewart was unable to drive past the gate.  Prior to the accident, Stewart and Ibarra sometimes rode to work together in Stewart's Camaro and Ibarra would drive when they got to the gate.[2]  Stewart and Ibarra had an argument that resulted in Stewart getting angry.  Stewart testified that "I kicked him out of my car."  Stewart could not drive on the Oxy leasehold and, consequently, he began riding with Mooney between the jobsite and the hotel.  Stewart testified that every time he rode with Mooney, Ibarra also was in the vehicle.

Mooney never asked Ibarra or Stewart to reimburse him for the rides.  More specifically, Mooney told Stewart that he did not have to pay for riding with him.  H&P never reimbursed Mooney, Ibarra or Stewart for the out-of-pocket cost of traveling to and from Oil Rig 261.  Similarly, H&P did not pay them for their travel time.

*Moving the Oil Rig*

Sometimes H&P moves an oil rig during a shift.  A rig move might be 10 feet on the same site or it might be to a new drilling site up to 15 miles away.  H&P does not provide transportation from an old drilling site to a new drilling site.  Consequently, each crew member usually travels to the new drilling site using the same vehicle that brought him to the original site.  For instance, if an employee carpooled to the original drilling site, that employee also would carpool to the new drilling site.  Mooney estimated that he took other workers to a new drilling site less than five times and that he never took Ibarra

---

**2**  Stewart also had given Mooney a ride to work on two occasions, according to the testimony of Mooney.  Mooney also testified that he had given and received rides from Johnny Jones, a rig manager who lived in Bakersfield.

from one site to another. Mooney also testified that he might be asked indirectly to transport another worker by the foreman saying, "This hand needs a ride."

H&P had never requested Mooney to transport equipment or supplies from a rig location in his vehicle. At the jobsite, Mooney generally would park his vehicle where it would not be "in the way."

## PROCEEDINGS

In January 2012, Pierson and his wife filed a personal injury action against Mooney. In December 2012, they added H&P as a doe defendant. In May 2013, Pierson filed a first amended complaint, which is the operative pleading in this case. It included the general allegation that each defendant was the employee of each remaining defendant and acted within the course and scope of that employment.

Travelers Property Casualty Company of America (Travelers), the worker's compensation insurer for Pierson's employer, intervened in this lawsuit. Travelers alleged that Mooney was the employee of H&P and that he was acting in the scope and course of his employment with H&P.

In November 2013, H&P filed a motion for summary judgment against Pierson and Travelers. The motion asserted that the incident occurred when Mooney was driving home from work and did not occur while he was in the course or scope of his employment with H&P. Pierson opposed this motion and filed his own motion for summary adjudication on the scope of employment issue.

In June 2014, the trial court granted summary judgment for H&P, concluding as a matter of law that the going and coming rule applied and, therefore, Mooney's operation of his vehicle at the time of the accident was not within the scope of his employment. Subsequently, a judgment was entered and Pierson filed a timely notice of appeal.

7.

**DISCUSSION**

I.    MOTIONS FOR SUMMARY JUDGMENT

      A.    <u>Triable Issues of Material Fact</u>

      A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A moving party is entitled to judgment as a matter of law when it establishes by admissible evidence that the "action has no merit." (Code Civ. Proc., § 437c, subd. (a)(1).)

      A defendant moving for summary judgment can meet this burden by presenting evidence demonstrating that one or more elements of each cause of action cannot be established. (Code Civ. Proc., § 437c, subds. (o), (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849-850, 853-854.) Once a defendant makes this showing, the burden shifts to the plaintiff to show a triable issue of material fact exists as to the challenged element or elements. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar*, *supra,* at p. 850.) A triable issue of fact exists if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Aguilar*, *supra*, at p. 845.)

      A motion for summary judgment or summary adjudication will be defective if the moving party fails to (1) accurately identify the facts that are material to the legal theory upon which the motion is based; (2) actually include those material facts in the separate statement; and (3) reference evidence establishing, either directly or by inference, each material fact the moving party claims is undisputed. (See *AMCO Ins. Co. v. All Solutions Ins. Agency, LLC* (2016) 244 Cal.App.4th 883, 904, fn. 8 [judgment reversed]; *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 632 [judgment reversed].)

B.	Standard of Review

Appellate courts independently review an order granting summary judgment. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*); *Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 334 (*Guz*).)  In performing this independent review, appellate courts apply the same three-step analysis as the trial court.  (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1602 (*Brantley*).)

First, the court identifies the issues framed by the pleadings.  In this case, the pleadings of Pierson and Travelers clearly framed a respondeat superior theory of liability against H&P by alleging that Mooney was acting in the course and scope of his employment with H&P at the time of the collision.

Second, the court determines whether the moving party has established facts justifying judgment in its favor.  Here, H&P attempted to establish that Mooney was not acting in the scope or course of employment by setting forth facts and presenting evidence that showed the going and coming rule applied.

Third, if the moving party has carried its initial burden, the court decides whether the opposing party has demonstrated the existence of a triable issue of material fact.  (*Brantley*, *supra*, 42 Cal.App.4th at p. 1602.)  Here, Pierson contends (1) the facts presented by H&P were insufficient to establish the going and coming rule applied and (2) there are triable issues of material fact relating to the "special errand" and "required-vehicle" exceptions to the going and coming rule.

During the second and third steps of the analysis, an appellate court considers the evidence in a light favorable to the nonmoving party, liberally construing that party's evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the nonmoving party's favor. (*Saelzler*, *supra*, 25 Cal.4th at pp. 768-769.)

Another rule of review affecting this appeal states that an appellate court's evaluation of the evidence presented with motions for summary judgment or adjudication

9.

does not include evidence to which objections have been made and properly sustained. (Code Civ. Proc., § 437c, subd. (c); *Guz, supra*, 24 Cal.4th at p. 334.)

## II. OVERVIEW: SCOPE OF EMPLOYMENT, GOING AND COMING RULE

### A. The Going and Coming Rule—Basic Principles

The doctrine of respondeat superior holds an employer liable for torts of its employees committed within the scope of their employment. (*Halliburton Energy Services, Inc. v. Department of Transportation* (2013) 220 Cal.App.4th 87, 93-94 (*Halliburton*).) Thus, a plaintiff suing an employer under the doctrine must prove that the tort was committed within the scope of employment. (*Id.* at p. 94.)

A corollary of the doctrine of respondeat superior is the "going and coming rule," which states that employees do not act within the scope of employment while going to or coming from the workplace. (*Jeewarat v. Warner Bros. Entertainment, Inc.* (2009) 177 Cal.App.4th 427, 435 (*Jeewarat*).) The rationale for the rule is that the employment relationship is suspended from the time the employee leaves work until he or she returns because an employee ordinarily renders no service to the employer while traveling. (*Ibid.*)

The going and coming rule is used in tort law to determine the scope of employment for purposes of respondeat superior liability and also is used in workers' compensation law to determine whether an employee injured while traveling to or from work sustained an injury "'arising out of and in the course of the employment'" for purposes of Labor Code section 3600. (*Hinman, supra*, 2 Cal.3d at p. 962, fn. 3.) The parties in this appeal have argued about the usefulness of workers' compensation cases as precedent for determining the scope of employment in tort litigation. In response to those arguments, we reach the following conclusions.

First, the coming and going rule applied in tort law to determine the scope of employment is not identical to the rule applied in workers' compensation law to

determine the course of employment. (*Hinman*, *supra*, 2 Cal.3d at p. 962, fn. 3.) Though not identical, the two versions of the rule are closely related. (*Ibid*.) The differences exist because the policy considerations underlying each field of law are different. This view of the going and coming rule is nothing new and has been confirmed by our most recent published decisions addressing the going and coming rule. (See *Lantz v. Workers' Comp. Appeals Bd.* (2014) 226 Cal.App.4th 298, 308, fn. 4 (*Lantz*); *Halliburton*, *supra*, 220 Cal.App.4th at p. 100 [commercial traveler rule applied in workers' compensation cases does not apply in respondeat superior cases]; *Fields v. State of California* (2012) 209 Cal.App.4th 1390, 1398 [scope of employment for tort purposes is more restrictive than course of employment under workers' compensation statute].)

Second, the workers' compensation cases *awarding coverage* under an exception to the going and coming rule cannot be categorically excluded as having persuasive force in tort cases involving the same exception and similar facts. The two versions of the rule and its exception are closely related and, as a result of this overlap, courts often cite tort and workers' compensation cases interchangeably. (*Caldwell*, *supra*, 176 Cal.App.3d at p. 1035.)

Third, workers' compensation cases *awarding coverage* do not necessarily provide reliable precedent for tort cases because the version of the rule applied in tort cases is more restrictive. (*Fields v. State of California*, *supra*, 209 Cal.App.4th at p. 1398.) For example, the court in *Caldwell*, *supra*, 176 Cal.App.3d 1028 stated: "While in certain circumstances payment of travel expenses may be an exception [to the going and coming rule] under workers' compensation laws [citation], the same conclusion has not been reached under respondeat superior doctrine. [Citation.]" (*Id*. at p. 1040.) Workers' compensation cases take a more expansive view of the test for course of employment than tort cases because the policies underlying the workers' compensation statute favor granting employee's coverage. These policies have caused the California Supreme Court to state in a workers' compensation case that "any reasonable doubt as to the applicability

11.

of the going and coming doctrine must be resolved in the employee's favor." (*Hinojosa v. Workmen's Comp. Appeals Bd.* (1972) 8 Cal.3d 150, 155-156 (*Hinojosa*), citing *Cal. Cas. Ind. Exch. v. Ind. Acc. Com.* (1943) 21 Cal.2d 751, 760; see *Caldwell*, *supra*, 176 Cal.App.3d 1028.)  In contrast, the vicarious liability imposed on employers by the respondeat superior doctrine is based on tort policies addressing the allocation of risk and shifting the cost of torts to the community at large.  (*Hinman*, *supra*, 2 Cal.3d at pp. 959-960, quoting Dean Prosser.)

In summary, the analysis used by courts in workers' compensation cases to direct or affirm coverage for the employee provide some guidance for analyzing respondeat superior cases because situations will arise where workers' compensation coverage overlaps with respondeat superior liability.  Despite this overlap, the analysis used in workers' compensation cases should not be applied in tort cases as though it was controlling.

B.    Case Specific Factors

The going and coming rule and its exceptions do not set forth a formula of automatic application.  (*Hinojosa*, *supra*, 8 Cal.3d at p. 156.)  Accidents involving employees traveling to and from work, or engaged in other types of travel, arise in so many varying circumstances that the application of the going and coming rule depends upon the facts of the particular case.  (*Id.* at p. 155 ["each case should be adjudged on its own unique facts"].)

The amorphous nature of the going and coming rule and its exceptions coupled with the case-by-case nature of the analysis might lead one to infer that it is extremely difficult for an employer sued under the doctrine of respondeat superior to obtain a summary judgment.  The case law, however, provides many examples of tort cases in which employer motions for summary judgment have been granted and affirmed on appeal.  (*Halliburton*, *supra*, 220 Cal.App.4th at p. 105 [summary judgment affirmed;

12.

driver was pursuing his own activities for his own purposes at the time of the accident]; *Anderson*, *supra*, 14 Cal.App.4th at p. 262 [summary judgment affirmed; employer encouragement of carpooling did not make carpooling fall within the special errand exception]; *Blackman v. Great American First Savings Bank* (1991) 233 Cal.App.3d 598, [summary judgment affirmed; special errand exception did not apply to employee who, after work, was traveling to college classes funded by employer's educational assistance program].)

To establish part of the context for the application of California's going and coming rule and its exceptions in this case, we provide a brief overview of (1) traffic accidents caused by employees working on oil drilling rigs and (2) carpooling.

### 1.     Oil Drilling Rigs

Businesses that operate oil drilling rigs or provide other oilfield services are faced with a combination of factors, which often include long shifts and remote work locations, that are not typical for most businesses.  This combination and the frequency of automobile accidents involving employees who work in oilfields has caused some courts to suggest or consider the possibility that oilfield businesses should have a separate exception to the going and coming rule.

In *Messenger v. Sage Drilling Co.* (1984) 9 Kan.App.2d 435 [680 P.2d 556], the appellate court examined a number of traffic accident cases involving drilling company employees.  (*Id*. at pp. 558-559.)  The court upheld the trial court's finding that the going and coming rule did not apply to the facts presented, stating:  "Oilfield cases from other jurisdictions are in accord." (*Id*. at p. 560.)  The decision's heavy reliance on other cases involving drilling company employees and its reference to oilfield cases from other jurisdictions suggested that cases involving oilfield workers were a distinct category.

This suggestion was echoed in a recent tort case where a plaintiff argued "that Texas has carved out an exception for travel to and from a drilling rigs in remote

locations." (*Painter v. Amerimex Drilling I, Ltd.* (2015 Tex.App.) 40 IER Cases 1516; [2015 WL 6705308].) In *Painter*, the appellate court noted the argument, but analyzed the facts presented under the special mission exception to the going and coming rule.**[3]** The court, in a 2-to-1 decision, held the trial court properly concluded the special mission exception did not apply and affirmed the trial court's order granting the employer's motion for summary judgment.

In *Roberts v. H-40 Drilling, Inc.* (10th Cir. 2012) 501 Fed. Appx. 759, a drilling company employee had completed his shift and was driving to a doctor's appointment when he struck and injured the plaintiff. (*Id.* at p. 760.) The plaintiff alleged the drilling company was liable under a theory of respondeat superior and specifically argued that the going and coming rule is applied differently when oilfield businesses are involved. (*Id.* at pp. 760-761.) The Tenth Circuit rejected this argument, concluding that Oklahoma courts apply the same going and coming rule to determine respondeat superior liability regardless of the nature of the employer's business. (*Ibid.*) Applying those general principles, the Tenth Circuit affirmed the grant of summary judgment in favor of the employer. (*Id.* at p. 762.)

Here, Pierson has not requested this court to create or recognize an exception to the going and coming rule tailored to drilling companies or oil rig workers. Consequently, we do not explicitly decide whether such an exception is appropriate in California.

---

**3** The automobile accident occurred after the workers' shift had ended while the crew leader (i.e., the driller) was driving the crew to the employer's bunkhouse about 30 miles from the drilling site. The driller was paid a $50 per day bonus for transporting the crew to the well location. The bonuses for drivers reduced the traffic going back and forth from the ranch where 30 or more rigs were operating at one time. (Cf. *Pilgrim v. Fortune Drilling Co., Inc.* (5th Cir. 1981) 653 F.2d 982, 986-987 [jury's verdict overturned; no respondeat superior liability for employer where employer and employee testified the employer did not control the transport of the drilling crew, despite payment of a per diem].)

### 2. *Carpooling as a Relevant Factor*

In this case, Mooney was providing a ride to his coworkers, Ibarra and Stewart, at the time of the accident. Pierson argues that their arrangement should not be considered carpooling and, in any event, the parties disagree over the role that carpooling or ridesharing plays in determining the scope of Mooney's employment.

First, we note that some states have adopted legislation to address whether carpooling or ridesharing employees are acting within the scope of their employment during their commute. Usually the legislation addresses the scope of employment for purposes of worker's compensation coverage. For example, an Ohio statute provides that workers' compensation is not available to employees injured while participating in a ridesharing arrangement between the employee's place of residence and place of employment because voluntary participation in a carpool or vanpool is not considered in the course of employment. (Ohio Revised Code, § 4123.452.) The statute is not a rule of exclusion, but establishes that voluntary ridesharing does not convert the personal nature of the typical work commute into an activity within the course of employment. (*Ruckman v. Cubby Drilling, Inc.* (1998) 81 Ohio St.3d 117, 126 [689 N.E.2d 917] [statute did not preclude carpooling oil riggers from demonstrating the special hazard exception to the going and coming rule applied; riggers obtained workers' compensation benefits for injuries sustained in traffic accidents that occurred while traveling to drilling site].)

The California Legislature has not adopted legislation, either in the tort or workers' compensation setting, that addresses (1) what constitutes carpooling or ridesharing and (2) whether employees participating in such an arrangement are acting within the scope of their employment. Consequently, the role that ridesharing plays in this appeal will be determined by applying California's common law tort principles relating to the doctrine of respondeat superior, the going and coming rule, and that rule's exceptions.

15.

Second, two published California decisions have discussed the relationship between carpooling and the scope of employment in the tort context—this court's decision in *Caldwell*, *supra*, 176 Cal.App.3d 1028 and the First Appellate District's more recent decision in *Anderson*, *supra*, 14 Cal.App.4th 254. In each case, the summary judgment entered in favor of the employer was affirmed. Pierson argues that *Anderson* and *Caldwell* are distinguishable because Mooney, Ibarra and Stewart were not "carpooling." In Pierson's view, a carpool involves workers who take turns giving each other rides so that they mutually benefit by spending less on gas. Pierson has cited no legal authority recognizing this distinction and has presented no policy reasons justifying the distinction. Consequently, we conclude the analysis adopted in *Anderson* and *Caldwell* is relevant to, but not determinative of, this appeal. (See *Hinojosa*, *supra*, 8 Cal.3d at p. 155 [each case must be adjudged on its own facts].)

Third, although California's formulation exceptions to the going and coming rule may not be identical to the exceptions recognized in other jurisdictions, we will refer to cases from other states that involve carpooling oil rig workers. For example, in *Anderson v. Falcon Drilling Co.* (Okla. 1985) 695 P.2d 521 (*Falcon Drilling*), the plaintiff sued a drilling company under the theory of respondeat superior, alleging its employee lost control of his vehicle and caused an accident during the course and scope of his employment. (*Id*. at p. 523.) The trial court granted the drilling company's motion for summary judgment. (*Ibid*.) The Oklahoma Supreme Court reversed, determining that a question of fact existed about whether the driver was acting within the scope of his employment at the time of the accident. (*Id*. at p. 526.)

In *Falcon Drilling*, the accident occurred while the driver and two other members of a crew that worked on a drilling rig were going to pick up the crew's fourth member at a location that was not on the driver's direct route to work. (*Falcon Drilling*, *supra*, 695 P.2d at p. 525.) The driver, the crew's immediate supervisor, was responsible for getting the crew to work on time to facilitate a smooth changeover between shifts. (*Ibid*.) To

16.

achieve this objective, the driller required his crew to carpool together. (*Ibid*.) If a crew member had objected to carpooling, the rig supervisor would have backed the driller's imposition of the requirement. (*Ibid*.) Based on the evidence presented, the Oklahoma Supreme Court determined there was a triable question of fact about the application of an exception to Oklahoma's going and coming rule—specifically, whether the driver "'was engaged in carrying out instructions given relative to performance of acts in his employment.'" (*Ibid*.)

### 3. *Summary of Factors*

The foregoing cases illustrate factors relevant to the application of the going and coming rule and its exceptions, including (1) the role played by the employer in any carpooling arrangements; (2) payments by the employer to its employees for the time or expenses incurred in commuting to the jobsite; (3) employer control over the commute; (4) the location of the accident compared to the route the driver would have taken if not transporting other employees; and (5) any incidental benefits accruing to the employer as a result of the employees' carpooling arrangements. For example, the first factor is addressed by evidence showing whether the employer requires employee carpooling, merely encourages it, or takes a neutral approach. (E.g., *Falcon Drilling*, *supra*, 695 P.2d at p. 525 [driller's imposition of carpooling requirement on crew members would have been supported by rig's supervisor]; *Caldwell*, *supra*, 176 Cal.App.3d at p. 1042 [carpooling was organized informally by individual workers].)

## III. EXCEPTIONS TO GOING AND COMING RULE

### A. Vehicle-Use Exception

#### 1. *Contentions of the Parties*

Pierson contends the trial court erred in granting summary judgment to H&P because there were triable issues of fact involving the applicability of the required-

vehicle exception. In particular, Pierson contends a jury could find that H&P implicitly required Mooney to use his vehicle as part of his job.

H&P argues the undisputed facts show that Mooney was driving his own vehicle at the time of the accident, H&P did not pay him for travel time or travel expenses, H&P was not involved in the logistics of how its employees got to the workplace, and H&P did not require Mooney to drive his personal vehicle to work. Based on these facts, H&P argues the required-vehicle exception does not apply to this case.

### 2. *Labels and Factual Elements*

The "required-vehicle" exception to the going and coming rule and its variants have been given many labels. In *Halliburton*, *supra*, 220 Cal.App.4th 87, we used the phrase "incidental benefit exception" as the equivalent of the required-vehicle exception. (*Id*. at p. 96.) In *Felix v. Asai* (1987) 192 Cal.App.3d 926 (*Felix*), we used the phrase "vehicle-use exception." (*Id*. at p. 932; see Comment, *Pouring New Wine into an Old Bottle: A Recommendation for Determining Liability of an Employer Under Respondeat Superior* (1994) 39 S.D. L.Rev. 570, 591 [vehicle-use exception].) The phrase "required-use doctrine" also has been used. (*Lobo v. Tamco* (2010) 182 Cal.App.4th 297, 302-303.) The "vehicle-use" variant appears in the title to California Civil Jury Instruction (CACI) No. 3725, "Going-and-Coming Rule—Vehicle-Use Exception." The various labels and the wide range of circumstances they cover have the potential to create uncertainty about the factual elements of the exception—a topic of particular importance when reviewing a motion for summary judgment for triable issues of *material* fact.

To structure our analysis of this exception, and assist the clear statement of the factual elements of its variants, we adopt the phrase "vehicle-use exception" from *Felix* and CACI No. 3725 to describe the exception in its broadest form. Next, under the umbrella of the vehicle-use exception, we recognize two identifiable categories with different factual elements. We label those two categories as the "required-vehicle

18.

exception" and "incidental benefit exception" because those labels emphasize the factual difference between the two categories.**4**

### B. Required-Vehicle Exception

#### 1. *Factual Elements of the Exception*

The "required-vehicle exception" covers situations where there is an express or implied employer requirement. "If an employer *requires* an employee to furnish a vehicle as an express or implied condition of employment, the employee will be in the scope of his employment while commuting to and from the place of his employment." (*Felix*, *supra*, 192 Cal.App.3d at p. 932, italics added.) The portion of CACI No. 3725 addressing an employer requirement states: "[I]f an employer *requires* an employee to drive to and from the workplace so that the vehicle is available for the employer's business, then the drive to and from work is within the scope of employment. The employer's *requirement* may be either express or implied." (Italics added.)

The directions to this jury instruction state that whether there is an express or implied requirement "can be a question of fact for the jury." (CACI No. 3725, Directions for Use.) The words "can be" were used instead of "always is" because the question of fact sometimes can be decided by a court as a matter of law. (E.g., *Caldwell*, *supra*, 176 Cal.App.3d at p. 1037 [summary judgment for employer affirmed; the facts did not show the employer requested or invited driver to provide another employee with transportation].)

In this case, Pierson does not contend that H&P imposed an express (i.e., oral or written) requirement on Mooney to furnish a vehicle. (Cf. Civ. Code, §§ 1620, 1622

---

**4**    Our division of the vehicle-use exception for purposes of this summary judgment motion should not be read as implying that this division is required, or even helpful, when presenting the scope of employment issue to a jury. The broad formulation of the vehicle-use exception in CACI 3725 correctly informs the jury that the issue of ultimate fact—namely, the scope of employment—may be proven in different ways.

[express means either written or oral]; *State Farm Mut. Auto Ins. Co. v. Haight* (1988) 205 Cal.App.3d 223, 241-242 [use of company van was an *express* condition of employment].)  Instead, Pierson contends a jury could find that H&P implicitly required Mooney to use his vehicle as part of his job.  Consequently, we consider whether there is a triable issue of material fact relating to the existence of an implied requirement.  (Code Civ. Proc., § 437c, subd. (c).)

### 2. *Implied Requirement and H&P's Undisputed Facts*

H&P's separate statement attempted to demonstrate the absence of an implied employer requirement by asserting that the following facts were undisputed:  (1) its employees are responsible for arranging and paying for their own transportation to and from the hotel and the work site; (2) sometimes Mooney would offer Ibarra a ride and other times Ibarra would ask Mooney for a ride; (3) Mooney's providing Ibarra a ride to and from the work site was not a condition of Mooney's employment with H&P; (4) there would have been no repercussions to Mooney's job status with H&P had he not provided Ibarra with a ride; (5) if Mooney had transported Ibarra, he simply would have asked someone else for a ride, such as another member of the crew; (6) Ilicio Vasquez, Matt Falvella and Rafael Gonzalez were crew members who had provided Ibarra with rides prior to the accident; and (7) if no crew member would have provided Ibarra with a ride, Ibarra would have arranged alternate transportation.

Pierson did not dispute the first two of these enumerated factual assertions and challenged the others only by submitting evidentiary objections.  The trial court overruled Pierson's evidentiary objections and Pierson has not challenged those adverse evidentiary rulings on appeal.  Consequently, we conclude H&P established that the facts enumerated in the foregoing paragraph are undisputed for purposes of its summary judgment motion.

20.

### 3. *Inferences Reasonably Drawn from the Facts*

Pierson's argument that a jury reasonably could find that H&P implicitly required Mooney to use his vehicle as part of his job is based on inferences drawn from other facts. Pierson argues a requirement is reasonably inferred because (1) Ibarra was Mooney's supervisor when he asked Mooney for rides to and from the hotel and (2) crews sometimes needed to be transported *during a shift* when the drilling rig was moved to a new site.

The rules of law that define the role of inferences in creating a triable issue of material fact are contained in subdivision (c) of Code of Civil Procedure section 437c. When reviewing a motion, the court shall consider the evidence set forth in the papers and "all inferences reasonably deducible from the evidence." (*Ibid*.) Generally, when conflicting inferences can be reasonably drawn from the evidence, a triable issue of fact is deemed to exist. (*Ibid*.; see *Lantz*, *supra*, 226 Cal.App.4th at p. 317.) Whether a particular inference is reasonable is not decided by evaluating an item of evidence in isolation. Instead, the reasonableness of an inference depends on all the evidence relevant to the issue. (See *Halliburton*, *supra*, 220 Cal.App.4th at p. 105 [inference supported by two general facts was not reasonable when evaluated in light of undisputed fact that the driver was pursuing his own activities for his own purposes at the time of the accident].)

In this case, the fact that Ibarra was Mooney's supervisor and asked Mooney for a ride to and from work, taken alone, might support an inference that Ibarra's request was attributable to H&P. (Cf. *Falcon Drilling*, *supra*, 695 P.2d at p. 525 [driller explicitly required oil rig crew to carpool together].) Such an inference, however, is unreasonable when considered in the context of other undisputed facts established by H&P. First, crew members, not H&P, were responsible for arranging their transportation to and from work. Second, providing transportation to Ibarra or other crew members was not a condition of Mooney's employment. Third, there would have been no repercussion to Mooney's job

21.

status if he did not provide Ibarra with a ride. These undisputed facts make it unreasonable to infer that when Ibarra asked Mooney for a ride to and from work, H&P was impliedly requiring Mooney to provide Ibarra with transportation.

Next, we consider the inferences related to the fact that H&P occasionally moved its drilling rigs. If the accident had occurred during such a rig move, this factor would have had much more importance. However, the accident occurred after a normal shift. Furthermore, H&P moved its drilling rigs only occasionally and, as a result, Mooney very seldom took crew members from one rig site to another and never transported Ibarra on such a move. When the rig was moved during a crew's shift, the crew members needed transportation to the new drilling site because H&P did not provide transportation. Crew members usually went to the new drilling site using the same vehicle that brought them to the original site. For instance, if employees carpooled to the original drilling site, those employees would carpool to the new drilling site. While traveling to the new drilling site during their shift, H&P employees remained on the clock.

The occasional need to change drilling sites during a shift is not a reasonable basis for inferring that Mooney or other crew members were impliedly required to drive their personal vehicles to work and provide other crew members with a lift between sites. It might be reasonable to infer that, if a crew member had his personal vehicle at the worksite, he might be required to provide other members of the crew with a lift to the new drilling site. However, it is not reasonable to work backward from such a requirement and infer crew members were required to drive to and from work in their personal vehicles. The other undisputed facts in the record preclude such an inference. In particular, providing transportation was not a condition of Mooney's employment and there would have been no repercussion to his job status if he did not provide Ibarra with a ride. It is not reasonable to infer the existence of a requirement when there are no adverse consequences for failing to comply with the alleged requirement. Here, nothing in the record shows that Mooney would have been in violation of an H&P requirement if

22.

he did not travel to and from work in his personal vehicle and, as a result, was unable to provide lifts to his coworkers when the drilling rig was moved during their shift. More specifically, nothing in the record shows that Mooney violated an implied requirement when he rode to work with Jones or Stewart instead of driving his personal vehicle. Based on the totality of the undisputed facts related to rig moves and employee transportation, it cannot be reasonably inferred that H&P impliedly required Mooney to transport crew members to and from the worksite in his personal vehicle.

Therefore, under the formulation of the required-vehicle exception adopted for purposes of this appeal, we conclude there is no triable issue of material fact relating to the existence of an implied requirement imposed on Mooney by H&P. In short, a jury could not reasonably find such a requirement exists.

### 4. *Hinojosa*

Pierson contends that *Hinojosa* supports the argument that Mooney was acting in the scope of his employment while on the way home. In *Hinojosa,* a workers' compensation case, a farm laborer was riding in a coworker's vehicle on his way home after work when he sustained an injury in a traffic accident. (*Hinojosa*, *supra,* 8 Cal.3d at p. 153.) The employer operated seven or eight noncontiguous ranches and hired farm laborers to thin and pick peaches, plums and apricots. (*Id.* at p. 152.) The workers did not know from day to day the fields where they would be working or the duration of that work. (*Ibid*.) The employer paid the workers for the time spent in transit between the ranches, but did not provide transportation. (*Ibid*.) Consequently, the nature of the work made it necessary for the workers to have transportation during the work day as the employer shifted the workers from one ranch to another. (*Ibid*.) The trier of fact, a workers' compensation referee, explicitly found the employer impliedly required the workers to furnish transportation. (*Id*. at p. 160.) The court determined the case clearly differed from the normal commute based on the implied requirement and the benefit the

23.

employer received from the transportation employees provided during the work day. (*Id.* at p. 162.) As a result, the court in *Hinojosa* reinstated the referee's award of workers' compensation benefits to the injured worker. (*Ibid.*)

We conclude that *Hinojosa* is legally distinguishable from the present case because it was a workers' compensation case and is factually distinguishable because the moves from field to field occurred *regularly* during the course of the workday. In this case, the moves were not regular and, as a result, Mooney did not regularly make his vehicle available to transport crew members to a new drilling site. Consequently, *Hinojosa* does not require us to conclude there is a triable issue of fact about the existence of an implied requirement to bring a personal vehicle to work.

C.      Incidental Benefit Exception

1.      *Factual Elements of the Exception*

Our formulation of the incidental benefit exception is based on the part of CACI No 3725 that states: "The drive to and from work may … be within the scope of employment if the use of the employee's vehicle provides some direct or incidental benefit to the employer. There may be a benefit to the employer if (1) the employee has agreed to make the vehicle available as an accommodation to the employer, and (2) the employer has reasonably come to rely on the vehicle's use and expects the employee to make it available regularly." (CACI No. 3725.) The "agreement may be either express or implied." (CACI No. 3725; see Civ. Code, § 1619 [contracts are "either express or implied"].) The existence of an express or implied agreement can be a question of fact for the jury. (CACI No. 3725, Directions for Use.)

CACI No. 3725 allows a plaintiff to prove the exception applies in two ways. The simplest way is to prove "the use of the employee's vehicle provides some direct or incidental benefit to the employer." (CACI No. 3725.) Under this approach, "'the key

24.

inquiry is whether there is an incidental benefit derived by the employer. [Citation.]'" (*Lobo v. Tamco*, *supra*, 182 Cal.App.4th at p. 301.)

The alternate way to establish the exception applies is for the plaintiff to prove "(1) the employee has agreed to make the vehicle available as an accommodation to the employer, and (2) the employer has reasonably come to rely on the vehicle's use and expects the employee to make it available regularly." (CACI No. 3725.) In workers' compensation cases, such an agreement may be inferred from the fact that (1) the employer furnished the vehicle used as an incident of employment or (2) the employer compensates the employee for the time consumed in traveling to and from work. (*Hinman*, *supra*, 2 Cal.3d at p. 962.) In torts cases, paying employees for travel time or expenses is not a sufficient basis for inferring an agreement exists. (*Caldwell*, *supra*, 176 Cal.App.3d at p. 1040.)

### 2. *Existence of an Agreement*

In this case, Pierson does not contend there was an express agreement relating to vehicle use. As to an implied agreement, the record contains less evidence of a consensual arrangement (i.e., a meeting of the minds) on the subject of crew transportation than it did of an implied requirement imposed unilaterally by H&P. Consequently, we conclude it is not reasonable to infer the existence of an *implied agreement* for the same reasons that it was not reasonable to infer the existence of an *implied requirement*. (See pt. III.B.3, *ante*.)

### 3. *Existence of the Requisite Type of an Employer Benefit*

As previously noted, not all benefits to the employer are of the type that satisfy the incidental benefits exception. The requisite benefit must be one that is "not common to commute trips by ordinary members of the work force." (*Hinman*, *supra*, 2 Cal.3d at p. 962.) Thus, employers benefit when employees arrive at work on time, but this benefit is insufficient to satisfy the incidental benefits exception. An example of a sufficient

25.

benefit is where an employer enlarges the available labor market by providing travel expenses and paying for travel time. (*Ibid*.) In *Hinman*, (1) the negligent driver was employed by Westinghouse as an elevator constructor's helper; (2) he drove directly between his home and the jobsite (i.e., he did not go to Westinghouse's office); (3) he was compensated under a union contract for an hour and a half of travel time per day and for travel expenses; and (4) Westinghouse had no control over the method or route of transportation used by the employee. (*Id*. at p. 959.)

Pierson's opening brief addressed benefits by arguing: "Allowing its supervisors to use their subordinates to provide free transportation allowed H&P to compete more effectively [for supervisors in the labor market], and at a lower cost." Pierson expanded on this argument by asserting:

> "Mooney's boss was using Mooney to transport him from the company-provided housing to the job site whenever he traveled from Kansas to Bakersfield to work. And he also directed Mooney to provide a ride to his co-worker, Stewart, so that Stewart could get through the security gate at the job site. [¶] The only benefit that Mooney received from this arrangement was the work-related benefit of pleasing his supervisor by agreeing to his requests for transportation for himself and for Stewart. The employer, however, received the benefit of expanding its labor force and of having Ibarra and Stewart on site and available for work."

We conclude this argument about competitive advantage, which turns the *Hinman* rationale on its head, does not identify the type of benefit that justifies imposing liability under the doctrine of respondeat superior. First, in *Hinman*, the employer took action in the form of payments that made working for it more attractive. Here, H&P took no actions to make it more competitive in the labor market. We are not convinced that H&P's failure to actively prohibit carpooling by its employees provides a competitive advantage similar to the payments made for travel time and costs in *Hinman*. Second, Pierson has presented no evidence from which a trier of fact reasonably could find that H&P actually achieved a competitive advantage by its inaction. Had Pierson shown that

many, or even some, drilling companies prohibit drillers or other supervisors from carpooling with crew members, there might have been evidence that would support a jury finding the type of benefit that distinguished H&P from other drilling companies and provided an actual (as opposed to theoretical) advantage. Without such evidence, we conclude there is no triable issue of fact relating to the benefit Pierson's argument claims exists.

Pierson also argues that H&P obtained a competitive advantage in the labor market from the use of Mooney's vehicle because rides allowed a crew-member who would otherwise not be able to get onto the jobsite access to the site. This argument is based on the fact that Stewart did not have a driver's license and Oxy required a valid driver's license to enter a gate onto the leasehold. Oxy enforced its requirement by issuing badges that stated whether or not the holder had license. Sometimes Stewart drove his car to the gate, left the car there, and caught a ride with another coworker from the gate to the rig. As with Pierson's other argument about an incidental benefit, this argument attempts to identify a benefit arising from the failure to prohibit crew members from giving other crew members a ride. As before, Pierson has not supported this argument with evidence about how this failure to take this action relates to the labor market and whether H&P's failure to prohibit ridesharing actually made it more competitive because of how other drilling companies behaved.

We also note that Pierson has not attempted to show the existence of benefits recognized by out-of-state cases involving carpooling oil rig workers. For example, Pierson has not shown carpooling was used to facilitate a smooth changeover of shifts by ensuring all members of a crew were at work on time. (See *Falcon Drilling*, *supra*, 695 P.2d at p. 525.) Also, Pierson has not shown that the number of vehicles at the Oxy leasehold created traffic or parking problems and, as a result, the employer benefited from the reduction in vehicle numbers that resulted from carpooling. (See *Painter v.*

27.

*Amerimex Drilling I, Ltd.*, *supra*, 40 IER Cases 1516 [bonus paid to driller for transporting crew to well location reduced traffic at ranch where 30 rigs were operating].)

For the reasons stated, Pierson has failed to show a triable issue of fact relating to the existence of an incidental benefit derived by H&P from Mooney's commuting in his personal vehicle.

D.     Special Errand Exception

1.     *Factual Elements of the Exception*

Under the special errand exception, an employee is considered within the scope of employment while coming from home or returning to it, while on a special errand either as part of his regular duties or at a specific order or request of the employer.[5] (*Fields v. State of California, supra,* 209 Cal.App.4th at pp. 1396-1397; see generally, Comment, The Special Errand Exception (1954) 6 Stan. L.Rev. 383.) An example of a special errand is the delivery of mail to a post office on the way home from work. (*Felix*, *supra*, 192 Cal.App.3d at p. 929.)

The parties did not dispute this formulation of the exception. Therefore, we do not address the other labels used for this exception and whether some of the many situations

---

[5]     A slightly longer description of the special errand exception was provided in *Boynton v. McKales* (1956) 139 Cal.App.2d 777 (*McKales*): "If the employee is not simply on his way from his home to his normal place of work or returning from said place to his home for his own purpose, but is coming from his home or returning to it on a special errand either as part of his regular duties or at a specific order or request of his employer, the employee is considered to be in the scope of his employment from the time that he starts on the errand until he has returned or until he deviates therefrom for personal reasons." (*Id*. at p. 789.)

In *McKales*, an intoxicated employee was driving his own vehicle home after attending a banquet held by the employer for employees with five or more years in its service. (*McKales, supra,* 139 Cal.App.2d at p. 790.) The jury found the driver had been acting within the scope of his employment and held the employer liable. The trial court granted the employer's motion for a new trial. The appellate court concluded the issue of scope of employment was correctly left to the jury and reversed the order granting a new trial. (*Id*. at pp. 791-792.)

it covers involve different factual elements.[6]  Furthermore, the facts of this case do not involve the possibility that the driver abandoned or deviated from the errand.  (See *Jeewarat*, *supra*, 177 Cal.App.4th at p. 435 [employees on a special errand act within the scope of employment until they deviate from the errand for personal reasons]; CACI No. 3724 [employee is no longer within scope of employment if "he or she completely abandons the errand for personal reasons"].)  Thus, we need not address any facts relevant to that aspect of the special errand exception.

### 2. *Contentions Related to the Special Errand Exception*

Pierson contends that Ibarra's status as Mooney's supervisor would allow the jury to impute Ibarra's requests for transportation to and from the jobsite to H&P and, thus, would trigger the special errand exception.  Pierson supports this contention with the following three principles.  First, "[i]t is possible for a special [errand] to be present when an employee gives a ride home to another employee.  (See *Harvey v. D & L Construction Co.* (1967) 251 Cal.App.2d 48, 52-53.)"  (*Caldwell*, *supra*, 176 Cal.App.3d at p. 1038.)  Second, the employer's request that triggers the special errand exception can be either express or implied.  (*C. L. Pharris Sand & Gravel, Inc. v. Workers' Comp. Appeals Bd.* (1982) 138 Cal.App.3d 584, 591.)  Third, the performance of the special errand by the employee need not be a condition of employment.  (*Ibid*.)  Based on these principles, Pierson contends that, if H&P expressly or impliedly requested Mooney to provide Ibarra with a ride back to the hotel, this case would fall within the special errand exception.

---

**6**     This exception sometimes is referred to as the "business errand" or the "special mission" exception.  (*Moradi v. Marsh USA, Inc.* (2013) 219 Cal.App.4th 886, 906, fn. 1; see CACI No 3724 [business errand exception].)  Witkin refers to it as the dual purpose exception.  (3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency, § 182, p. 230 [where employee's going or coming has some additional business purpose, the employee may be considered acting within the scope of employment during the whole period]; see Rest. 2d Agency, § 236 [conduct actuated by dual purpose].)

H&P contends that the special errand exception does not apply because carpooling among the crew members of Oil Rig 261 were commonplace and not the result of any influence by H&P. H&P asserts that it did not involve itself in its employee's transportation to and from work and, as an example of Ibarra's relationship with crew members, refers to Stewart's testimony that he "kicked [Ibarra] out of my car" as the result of an argument that caused Stewart to get angry. In H&P's view, the facts presented would not allow a reasonable trier of fact to find that H&P had ordered or requested Mooney to provide transportation to Ibarra or Stewart.

### 3. Imputing Ibarra's Request to H&P

The contentions of the parties clearly define the dispute related to the application of the special errand exception. That dispute relates to whether Ibarra's request to Mooney for a ride to and from the jobsite can be imputed to H&P. Placing this issue in its procedural context (i.e., a motion for summary judgment), we consider whether H&P carried its initial burden of demonstrating that Ibarra was acting on his own behalf, not H&P's, when he requested rides from Mooney. (See *Brantley*, *supra*, 42 Cal.App.4th at p. 1602 [second step of three-step analysis applied to motions for summary judgment].) If H&P carried that burden, we consider whether Pierson has demonstrated the existence of a triable issue of material fact about whether Ibarra's requests can be imputed to H&P. (*Ibid.* [third step of three-step analysis].)

We conclude that H&P has carried its initial burden of demonstrating that Ibarra was acting on his own behalf when he requested rides from Mooney. The basis for this conclusion is the same undisputed facts and evidence that supports our earlier determination under the required-vehicle exception that there was no triable issue of material fact relating to the existence of an implied requirement imposed on Mooney by H&P. (See pt. III.B.3, *ante*.)

Therefore, the critical question is whether Pierson demonstrated the existence of triable issue of material fact about imputing Ibarra's requests to H&P. The legal principles underlying Pierson's argument about imputed authority are not developed in H&P's appellate briefing.

As background, we note that there is a large body of law addressing the authority of an agent to act on behalf of a principal. (See generally, 3 Witkin, Cal. Procedure, *supra*, Agency, §§ 134-138 [actual authority], 144-148 [ostensible authority]; 2B Cal.Jur.3d (2015) Agency, §§ 59-74, pp. 219-240 [express, implied and incidental authority].) For example, Civil Code section 2297 addresses the difference between a special and a general agent. Civil Code section 2298 states than "[a]n agency is either actual or ostensible." Civil Code section 2299 states that an actual agency is "when the agent is really employed by the principal." In this case, it is undisputed that Ibarra was employed as a driller on Oil Rig 261 and, in that position, supervised the other members of the crew.

The authority of agents to act for their principal is addressed in the article of the Civil Code that contains sections 2304 through 2326. Under Civil Code section 2315, an agent has the authority that the principal actually or ostensibly confers upon him. In this case, Pierson does not contend that Ibarra was given actual authority by H&P to require Mooney to provide transportation. Thus, Pierson's argument about an imputed request can be rephrased as an argument about ostensible authority. "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (Civ. Code, § 2317; see Civ. Code, § 2316 [actual authority defined].) A corollary derived from this principle is that ostensible authority of an agent cannot be based solely upon the agent's conduct. (*Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 747.) Whether an agent has ostensible authority is a question of fact and such authority may be implied from

31.

circumstances. (*Id.* at p. 748 [summary judgment reversed, plaintiff introduced some evidence raising a triable issue of fact on ostensible agency theory].)

The facts relied upon by Pierson for imputing Ibarra's requests for rides to H&P include (1) Ibarra's role as Mooney's supervisor; (2) the inability of either Ibarra or Mooney to recall whether Ibarra requested a ride the day of the accident or whether Mooney volunteered to give Ibarra a ride; (3) Ibarra's lack of personal transportation and his routine requests for rides from crew members; (4) Ibarra's inability to reciprocate in providing rides to others; (5) the many times that Mooney had given Ibarra a ride to and from the jobsite; and (6) Mooney's testimony that Ibarra would tell Mooney that he wanted to be picked up and taken somewhere and that Mooney would do it. In addition, Pierson's separate statement asserted that Ibarra had the authority to recommend termination of an H&P employee that he supervised. Though not set forth in Pierson's separate statement, his opening brief cited deposition testimony by Mooney and Stewart for the fact that they believed Ibarra had the authority to either fire them, or have them fired.

The facts and evidence relied upon by Pierson relate primarily to the conduct of Ibarra and not conduct of H&P that provides a basis for imputing Ibarra's requests for rides to H&P. The conduct of H&P relates to its hiring Ibarra as the supervisor of one of the crews working on Oil Rig 261 and giving him the authority to recommend termination of crew members. In light of the other actions of H&P that made employees responsible for their own transportation, there is no reasonable basis for inferring H&P's conduct caused or allowed crew members to believe that Ibarra's requests for rides were made on behalf of H&P.

32.

E.    Evidence Relating to Workers' Compensation Claims

Our determination that there is no triable issue of material fact does not rely on the status of any workers' compensation claim that Mooney may have filed relating to injuries he received in the traffic accident.  Consequently, the parties' factual dispute about the status of any such claim does not create a triable issue of fact that must be resolved by a jury.

**DISPOSITION**

The judgment is affirmed.  Defendant shall recover its costs on appeal.

_____
FRANSON, J.

WE CONCUR:


_____
HILL, P.J.


_____
SMITH, J.

33.

Filed 10/24/16

## CERTIFIED FOR PUBLICATION

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BRENT DALE PIERSON et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> HELMERICH & PAYNE INTERNATIONAL DRILLING CO., <br><br> Defendant and Respondent; <br><br> TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, <br><br> Intervener and Respondent. | F070379 <br><br> (Super. Ct. No. S-1500-CV-275575) <br><br> **ORDER MODIFYING OPINION BY CERTIFYING OPINION FOR PUBLICATION** <br> **[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

The opinion in the above-entitled matter filed on October 6, 2016, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.  (Cal. Rules of Court, rule 8.1105.)

FRANSON, J.

WE CONCUR:

HILL, P.J.

SMITH, J.