Filed 12/12/17

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY,<br><br>        Plaintiff and Appellant,<br><br>              v.<br><br>HART HIGH-VOLTAGE APPARATUS REPAIR AND TESTING CO., INC.,<br><br>        Defendant and Respondent. | F072904<br><br>(Super. Ct. Nos. CV003013, CVM013599)<br><br>**OPINION** |

        APPEAL from a judgment of the Superior Court of Merced County.  Donald J. Proietti, Judge.

        Urrabazo Law, Donald Urrabazo, Arturo Padilla and Joon Song for Plaintiff and Appellant.

        Michel & Fackler, Michael D. Michel, Kate Morrow and Jeff M. Fackler for Defendant and for Respondent.

-ooOoo-

---

*        Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.C. and part II. of the Discussion.

Plaintiff Pacific Gas and Electric Company (PG&E) sued defendant HART High-Voltage Apparatus Repair and Testing Co., Inc. (HART) for negligently servicing a large transformer at a hydroelectric power plant and for damages under Public Utilities Code[1] section 7952. PG&E alleged it incurred dirct and indirect costs of approximately $8.1 million.

HART filed a motion for summary adjudication that challenged all of PG&E's causes of action.[2] The trial court determined the evidence showed MID owned the power plant and the transformer allegedly damaged by HART. The court concluded that because PG&E did not own the transformer, PG&E could not prove essential elements of its causes of action for negligence and damages under section 7952.

In the unpublished parts of this opinion addressing PG&E's negligence cause of action, we conclude (1) PG&E has standing to sue if it is a "real party in interest" pursuant to Code of Civil Procedure section 367 and (2) the evidence presented shows PG&E held sufficient interests in the transformer and the electricity it delivered to qualify as a real party in interest. Using the "bundle of sticks" metaphor in which each stick represents a legally recognized property interest, we conclude PG&E held sufficient sticks to qualify as a real party in interest. Therefore, PG&E may pursue its negligence cause of action against HART.

---

[1]    All unlabeled statutory references are to the Public Utilities Code.

[2]    The same motion for summary adjudication was before this court in *Merced Irrigation District v. Superior Court* (2017) 7 Cal.App.5th 916, where we concluded another plaintiff, Merced Irrigation District (MID), was not a "municipal corporation" for purposes of section 10251 and, therefore, not entitled to recover damages under section 10251. Based on that statutory interpretation, we upheld the grant of summary adjudication eliminating MID's cause of action under section 10251.

In the published parts of this opinion addressing PG&E's claim for damages under section 7952,[3] we reach the following conclusions. First, the transformer was "necessary or useful … equipment" as that phrase is used in section 7952. Second, PG&E is an "electrical corporation" for purposes of section 7952. Third, the preposition "of" in the phrase "equipment of any … electrical … corporation" is used in the proprietary sense— that is, it refers to the corporation's ownership of property interests in the equipment. Fourth, the ownership of property interests in the equipment need not be *complete* ownership because the phrase "equipment of any … electrical … corporation" also encompasses equipment in which the corporation is a partial owner—that is, holds some of the sticks in the bundle that represent the property interests in the equipment. Fifth, the evidence presented shows PG&E holds multiple property interests in the transformer and, thus, PG&E might be regarded as a partial owner of the transformer entitled to recover the measure of damages set forth in section 7952. Therefore, HART has not carried its burden of demonstrating PG&E's cause of action for damages under section 7952 lacks merit.

We therefore reverse the judgment and remand for further proceedings.

## FACTS

PG&E, a California corporation, is a public utility regulated by the California Public Utilities Commission, and its stock is publicly traded under the symbol "PCG." PG&E provides gas and electrical service to about 15 million end users in northern and central California.[4] The other plaintiff in this lawsuit, MID, is an irrigation district

---

[3] The first sentence of section 7952 states: "Any person who injures or destroys, through want of proper care, any necessary or useful facility or *equipment of any … electrical … corporation*, is liable to the corporation for all damages sustained thereby." (Italics added.) The second sentence specifies a broad measure of damages, which includes indirect or overhead expenses. Thus, the damages recoverable under section 7952 might be much broader than those recoverable under the negligence cause of action.

[4] *Panoche Energy Center, LLC v. Pacific Gas & Electric Co.* (2016) 1 Cal.App.5th 68, 72.

organized under the laws of the State of California with its principal place of business in Merced County.

PG&E and MID alleged they were "the owners and operators of a transformer located at the Exchequer Dam on the Merced River" in Merced County. The transformer was an Allis-Chalmers 100 MVA Auto Transformer and was part of the power plant at the Exchequer reservoir. The transformer was large, measuring almost nine feet wide, 23 feet long, and 12 feet high. When operational, the transformer contained approximately 6,800 gallons of oil and weighed 243,000 pounds. The transformer had been custom built to take the 13.8 kilovolt electricity generated at the Exchequer dam and transform it into voltages (i.e., 70 kilovolt and 115 kilovolt) that were fed into two separate transmission systems owned by PG&E.

The relationship between PG&E and MID as it pertains to the power plant and equipment located at the Exchequer reservoir is defined by their June 25, 1964, power purchase contract. The power purchase contract stated MID "shall construct at its own risk and expense, and shall be the sole owner (under Federal Power Commission License) of, the *project*" and set forth the requirements and specifications for its design and construction.[5] The specifications addressed the project's turbines, generators, and the transformer that is the subject of this litigation.

PG&E contends the power purchase contract (1) entitled it to all electricity generated by the project; (2) made it responsible for all costs associated with maintaining and operating the Exchequer power plant; and (3) granted it the right to enter upon,

---

[5]    The contract defined the term "*project*" as "[a] development using the waters of Merced River and including Exchequer Reservoir, McSwain Reservoir, Exchequer Power Plant, McSwain Power Plant, dams, *project communication facilities*, *project headquarters* and *project roads*, tools, operation and maintenance equipment, including motor vehicles, and all necessary appurtenances for each of the foregoing." The term "Exchequer Power Plant" was defined as "[a] hydroelectric generating facility to be constructed on Merced River at the reconstructed Exchequer Dam, including an intake structure, a penstock, a power house, and appurtenant facilities."

4.

operate and maintain any part of the power plant in the event that MID failed to operate and maintain the project in accordance with the power purchase contract.

In July 2009, HART submitted a quote to MID for servicing the transformer. The work involved draining the transformer of insulating fluid, performing an internal inspection, removing and replacing five electro coolers, replacing a variety of gaskets, replacing other parts, refilling the transformer and performing tests. HART estimated the total price for this work at $122,415.

In September 2009, MID and HART signed Exchequer Contract 2009-08 pursuant to which MID agreed to the payment terms in the quote HART submitted and HART agreed to "perform all services as outlined in 'Quotation # 090825' dated Sept. 19, 2008, to PG&E's 'Construction Service Specification No. 4720 Rev. 2'."[6] The procedures HART agreed to perform stated HART would "[v]erify all tools and materials have been removed from the transformer after internal inspection and repairs have been performed."

HART also agreed to maintain insurance coverage in accordance with MID's written requirements. HART obtained $1 million in commercial general liability insurance and $5 million in excess/umbrella liability insurance. MID, but not PG&E, was named as an additional insured in the certificate of liability insurance.

On November 1, 2009, HART started performing the servicing work on the transformer. On November 5, 2009, a HART employee was reconnecting low-voltage leads inside the transformer. Another HART employee who was outside the transformer handed him a flat washer, a lock washer and a bolt. When the first employee brought the washers and bolt inside the transformer, his hand struck a support beam, which caused him to drop the washers and bolt into the transformer's windings. The bolt and lock washer were retrieved with a magnet, but attempts to retrieve the flat washer resulted in

---

**6**    Neither the Exchequer Contract 2009-08 nor HART's quotation *explicitly* identified PG&E as a party to the contract or as a third party beneficiary.

the washer falling further inside the windings. Additional attempts to retrieve the washer were unsuccessful.

HART asserted (1) the transformer was not physically damaged as a result of having the washer was dropped into it and (2) MID chose not to reenergize the transformer, allegedly out of concern that the transformer could be damaged if it was restarted with a loose washer inside it. PG&E disputed this assertion, stating the transformer was damaged. PG&E contended all parties agreed the transformer could not be reenergized with a loose metallic washer inside and, consequently, the transformer was rendered unsuited for its intended purpose and had to be replaced. PG&E and MID believed that energizing the transformer with the metallic washer inside would likely lead to a fire that would destroy the transformer and might cause an oil spill that would contaminate the Merced River.

## PROCEEDINGS

In November 2012, the first lawsuit arising out of the washer incident was filed against HART. Federal Insurance Company, as the subrogee of the ACWA Joint Powers Insurance Authority, sought to recover funds paid to MID under an insurance policy that covered the transformer. The subrogation action was filed in Merced County Superior Court and assigned case No. CV003013.

In December 2012, PG&E and MID, as coplaintiffs, filed a lawsuit against HART in Merced County Superior Court for damages arising out of the washer incident. In February 2013, based on a stipulation of the parties, the trial court consolidated the two lawsuits against HART.

In August 2013, MID assigned all rights to its causes of action arising from the washer incident to PG&E, including the cause of action for breach of contract. In the assignment agreement, MID represented that it had received $1,032,000 pursuant to its insurance contract with the Joint Powers Insurance Authority to partially compensate it for damages or losses arising from the incident, which funds it agreed to forward to

6.

PG&E. MID also represented: "It has been fully compensated by PG&E for any costs and/or expenses M[ID] has incurred arising from or related to the Incident." MID and PG&E also agreed they would be represented by the same law firm in the lawsuit against HART, with PG&E being solely responsible for the attorney fees and costs of that representation.

In August 2014, PG&E and MID filed a first amended complaint, which is the operative pleading in this matter. The first amended complaint alleged four causes of action against HART: (1) negligence, (2) breach of contract, (3) violation of section 7952, and (4) violation of section 10251. The first amended complaint used the plural "plaintiffs" in each cause of action and, as a result, it appeared that PG&E was asserting claims under four legal theories. Subsequently, PG&E clarified that it was not claiming recourse to section 10251 and, on appeal, PG&E expressly abandoned the breach of contract cause of action. Accordingly, the causes of action for breach of contract and for violation of section 10251 are not analyzed in this opinion.

*Motion for Summary Adjudication*

In June 2015, HART filed a motion for summary adjudication as to all of PG&E's causes of action and as to MID's causes of action for violations of sections 7952 and 10251. The motion did not challenge MID's causes of action for negligence and breach of contract.

HART's separate statement of undisputed material facts asserted HART and MID were the only parties to the written contract for performing work on the transformer and, therefore PG&E was not a party to the contract. Based on these factual assertions, HART argued any duty of care (an essential element of a negligence claim) that might have been created by the maintenance contract did not extend to PG&E.

HART's separate statement also asserted other facts were material and undisputed. The paragraphs most important to this appeal stated:

"6. At the time of the incident alleged in plaintiffs' complaint, [MID] was the sole owner of the Exchequer Transformer.  [¶] … [¶]

"7. PG&E did not own the transformer at the time of the incident."

The evidentiary support for these assertions as to the ownership of the transformer included various discovery responses and the June 25, 1964, power purchase contract between MID and PG&E, which stated MID "shall construct at its own risk and expense, and shall be the sole owner (under Federal Power Commission License) of, the *project*." HART emphasized the contract's reference to MID as "the sole owner" and did not discuss the effect of the parenthetical immediately following that phrase.

PG&E's opposition papers addressed the question of ownership by (1) disputing paragraphs 6 and 7 of HART's separate statement and (2) asserting PG&E "did have ownership rights in the Exchequer Transformer at the time of the incident pursuant to the Power Purchase Agreement and under California statute."  PG&E argued its ownership rights (1) entitled it to all electricity generated by the project; (2) made it responsible for all costs associated with maintaining and operating the Exchequer power plant; and (3) granted it the right to enter upon, operate and maintain any part of the power plant in the event that MID failed to operate and maintain the project in accordance with the 1964 power purchase contract.  PG&E stated its rights were protected by paragraph 12 of the 1964 power purchase contract, which stated in full:

"[MID] shall maintain and defend its land, easements, flowage rights, water rights, Federal and State licenses and permits, and all other rights and privileges necessary or useful to the operation of the *project* and shall not voluntarily convey, transfer or in any manner encumber any of such rights without the written consent of [PG&E]."

Similarly, paragraph 18 of the 1964 power purchase contract states no voluntary assignment of the contract shall be effective without the written consent of PG&E.  This prohibition contains an exception that authorizes an assignment as security for MID's financing of the project.

*Order Granting Summary Adjudication*

In September 2015, the trial court held a hearing on HART's motion for summary adjudication. In October 2015, the trial court filed a written order granting summary adjudication in favor of HART and against PG&E on all the causes of action stated in the operative complaint.

As to PG&E's negligence cause of action, the trial court's order stated HART was "entitled to judgment as a matter of law on the grounds that [HART's] Undisputed Material Facts Nos. 6 and 7 establish [PG&E] cannot prove an essential element of the claim for negligence, that is that [PG&E] was an owner of the property allegedly damaged by [HART]." The order also stated PG&E did not present admissible evidence supporting an inference that it possessed an ownership interest in the transformer. As to MID's assignment to PG&E of its claims and causes of action against HART, the court concluded the assignment was irrelevant because the operative pleading did not allege (1) PG&E was an assignee or (2) PG&E's cause of action for negligence was based on an assignment of rights from MID.

As to PG&E's cause of action under section 7952, the order stated HART was "entitled to judgment as a matter of law on the grounds that [HART's] Undisputed Material Facts Nos. 6 and 7 establish [PG&E] cannot prove an essential element of the claim for violation of Section 7952, that is that [PG&E] was the owner of the 'necessary and useful equipment' allegedly damaged by [HART]."

The order granting summary adjudication disposed of all of PG&E's causes of action against HART. Accordingly, in November 2015, the trial court entered a judgment stating (1) PG&E would recover nothing from HART on its complaint and (2) PG&E was liable for HART's costs. In December 2015, PG&E filed a notice of appeal from the judgment.

*Judicial Notice of Legislative History*

In June 2016, PG&E requested this court take judicial notice of documents compiled by LRI History LLC[7] relating to Statutes 1969, chapter 709 (Sen. Bill No. 939) and Statutes 1976, chapter 617 (Assem. Bill No. 3398). These statutes amended section 7952 and enacted section 10251, respectively. In July 2016, this court granted the request for judicial notice, which was unopposed.[8]

## DISCUSSION

I.    OVERVIEW OF BASIC CONCEPTS

An analysis of the parties' contentions relating to PG&E's standing to sue for negligence requires an understanding of the basic legal concepts of property, ownership and standing to sue. The concepts of property and ownership also are relevant to the analysis of PG&E's claim under section 7952.

A.    Property v. Property Interest

The word "property" has multiple meanings.[9] (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 157 (*Union Pacific*).) Sometimes "property" is used simply to refer to the physical object in question–that is, the thing itself. (*Ibid.*) Other times, the word "property" is used with greater accuracy to "'to denote the legal interest (or aggregate of legal relations) appertaining to such physical object.'" (*Ibid.*) When used in the latter sense, "property" is composed of a

---

[7]    The authentication submitted with the documents comprising the legislative history stated LRI History LLC was formerly (1) Legislative Research Institute; (2) Legislative Research, Incorporated; and (3) Legislative Research & Intent LLC.

[8]    This court also granted MID's request for judicial notice of the same legislative history in a writ proceeding involving HART's motion for summary adjudication. (*Merced Irrigation District v. Superior Court*, *supra*, 7 Cal.App.5th at p. 923.)

[9]    The concept of property varies from context to context. For example, the scope of the concept of property under the takings clause is more restricted than the concept of property recognized under the due process clause. (See *California Chamber of Commerce v. State Air Resources Bd.* (2017) 10 Cal.App.5th 604, 646-647.)

10.

"'complex aggregate of rights (or claims), privileges, powers, and immunities.'"
(Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*
(1917) 26 Yale L.J. 710, 746 (*Hohfeld*).)

Therefore, in a strict legal sense, a physical object such as the transformer is not itself "property," but the subject of property. (*Union Pacific*, *supra*, 231 Cal.App.4th at p. 157.) When used in this strict legal sense, the term "property" means only the rights, privileges, powers and immunities of the owner in relation to the thing, despite the use of the term to designate the thing (such as land or a chattel) itself. (*Ibid*.) These rights, privileges, powers and immunities include the possession, use, enjoyment and disposition of the thing. (*Ibid*.)

Stated another way, "property" is the sum of all the legally recognized rights, privileges, powers and immunities incident to ownership of the thing. (See *Dickman v. Commissioner* (1984) 465 U.S. 330, 336; *Hohfeld*, *supra*, 26 Yale L.J. at p. 746.) The "bundle of sticks" metaphor[10] often is used to describe property, with each stick representing a right, privilege, power or immunity. (E.g., *Union Pacific*, *supra*, 231 Cal.App.4th at p. 157; see *Sterling Builders, Inc. v. United Nat. Ins. Co.* (2000) 79 Cal.App.4th 105, 109.)

B.      Ownership of Property

The definition of "owner" set forth in Black's Law Dictionary states: "One who has the right to possess, use and convey something; *a person in whom one or more interests are vested.* ⋅ An owner may have complete property in the thing or may have parted with some *interests* in it (as granting an easement or making a lease)." (Black's

---

[10]      Professor Wonnell of the University of San Diego Law School observed: "Theorists may tell us that property is a bundle of severable sticks, but it is remarkable how frequently that insight is forgotten when it is most needed." (Wonnell, *Replacing the Unitary Principle of Unjust Enrichment* (1996) 45 Emory L.J. 153, 196.) He then describes the right to recover an asset's monetary value as a normal aspect of property—that is, a stick in the bundle. (*Ibid*.)

Law Dict. (8th ed. 2004) 1137, italics added.)  The use of the word "interests" in this definition of "owner" establishes a connection to the definition of "property" discussed earlier.  Specifically, "interest" is defined as follows:  "Collectively, the word includes any aggregation of rights, privileges, powers, and immunities; distributively, it refers to any one right, privilege, power, or immunity."  (Black's Law Dict., *supra*, at p. 828; see *Union Pacific*, *supra*, 231 Cal.App.4th at p. 157.)  Thus, the word "interests" is an overarching label for the rights, privileges, powers and immunities that aggregate to constitute "property."

The term "owner" is applied to a variety of situations, as is demonstrated by the types of owners listed in Black's Law Dictionary.  The list includes "beneficial owner," "legal owner," "general owner," "special owner" and "limited owner."  (Black's Law Dict., *supra*, at pp. 1137-1138.)  A "beneficial" or "equitable owner" is defined as "[o]ne recognized *in equity* as the owner of something because use and title belong to that person, even though legal title may belong to someone else; esp., one for whom property is held in trust."  (*Id*. at p. 1137, italics added; see *Miller v. Dyer* (1942) 20 Cal.2d 526, 529 [equitable owner].)  In contrast, the "legal owner" is "[o]ne recognized *by law* as the owner of something; esp. one who holds legal title to property for the benefit of another." (*Id*. at p. 1138, italics added; see *Parkmerced Co. v. City and County of San Francisco* (1983) 149 Cal.App.3d 1091, 1094-1095 ["legal title" is the antithesis of "equitable title"].)  A "special owner" has a qualified interest in property (such as a bailee), while the "general owner" holds the primary or residual title to the property.  (Black's Law Dict., *supra*, at p. 1138; 73 C.J.S. (2017) Property, §39 [general owner].)  A "limited owner" is defined as a tenant for life or the owner of a life estate.  (*Ibid*.)

To summarize the concepts of property and owner, California law recognizes a wide range of interests are included in the bundle of sticks that constitutes "property" and those sticks may be divided and held (i.e., owned) among multiple persons.

C.    <u>Standing to Sue</u>[*]

"Standing" refers to a person's right to make a legal claim or seek judicial enforcement of a duty or right.  (*Librers v. Black* (2005) 129 Cal.App.4th 114, 125; Black's Law Dict., *supra*, at p. 1442.)  "At its core, standing concerns a specific party's interest in the outcome of the lawsuit."  (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247.)  According to the California Supreme Court, Code of Civil Procedure section 367 contains California's general standing requirements.  (*Weatherford*, *supra*, at p. 1249.)  The statute provides in full:  "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute."  (Code Civ. Proc., § 367)  For purposes of this appeal, the key statutory term is "interest."

Under one definition, the "real party in interest" is the person possessing the right sued upon by reason of the substantive law.  (*Iglesia Evangelica Latina, Inc. v. Southern Pacific Latin American Dist. of the Assemblies of God* (2009) 173 Cal.App.4th 420, 445 (*Iglesia*); 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 121, p. 187 [person who has the right to sue under substantive law is the real party in interest].)  Thus, having standing and being a "real party in interest" are the same thing.  The inquiry into standing "calls for a consideration of rights and obligations."  (4 Witkin, Cal. Procedure, *supra*, § 121, p. 187.)

One test for standing is whether the plaintiff has a real *interest* in the ultimate adjudication, meaning the plaintiff has either suffered or is about to suffer an injury of sufficient magnitude to reasonably assure that all of the relevant facts and issues will be adequately presented.  (*Schmier v. Supreme Court* (2000) 78 Cal.App.4th 703, 707.)  Another version of the test for standing states "a party must be beneficially *interested* in the controversy, and have 'some special *interest* to be served or some particular right to

---

[*]    See footnote, *ante,* page 1.

be preserved or protected.' [Citation.] This *interest* must be concrete and actual, and must not be conjectural or hypothetical." (*Iglesia*, *supra*, 173 Cal.App.4th at p. 445, italics added.)

## II. PG&E'S NEGLIGENCE CAUSE OF ACTION[*]

The operative complaint alleges (1) HART negligently conducted the maintenance and repairs of the transformer by dropping the washer into it; (2) the negligence was a proximate cause of the transformer becoming unusable; and (3) as a direct and proximate result of the negligence, PG&E sustained damages in the form of property damage, loss of use, lost profits and future loss of profits. The trial court's grant of summary adjudication on PG&E's negligence claim because PG&E was not an owner of the transformer can be restated as the court concluding PG&E lacked standing to pursue the negligence claim.

### A. Contentions of the Parties

#### 1. PG&E

PG&E contends the trial court erred when it concluded ownership of the transformer was an essential element of PG&E's negligence cause of action. HART supports its view of California law by referring to the following statement by the California Supreme Court: "The propriety of an action for damages to property by one who is not in possession or entitled to possession at the time of its injury has been recognized in this state under varying factual circumstances." (*Wolfsen v. Hathaway* (1948) 32 Cal.2d 632, 644, overruled on another ground in *Flores v. Arroyo* (1961) 56 Cal.2d 492, 497.) Responding to the trial court's reference to essential elements, PG&E cites *Vaughn v. Dame Construction Co.* (1990) 223 Cal.App.3d 144, where the court stated "the essential element of the cause of action [for defective construction] is injury to

---

[*]      See footnote, *ante,* page 1.

14.

one's *interests in the property*—ownership of the property is not." (*Id*. at p. 148, italics added.)

PG&E also contends it has standing to bring a negligence cause of action because HART owed it a duty of care. PG&E relies on the factors set forth in *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*), at page 650 to establish a duty of care in the absence of privity between HART and PG&E. In addition, PG&E argues the public policy of efficiently providing Californians with water and power favors the recognition of its negligence claim against HART.

### 2. HART

HART contends the legal principle applicable to PG&E's negligence cause of action is simple and can be stated as follows: "Only the owner of negligently-damaged property has standing to sue for damages alleged caused by the damage to that property." HART argues its evidence demonstrated (1) PG&E was not an owner of the transformer and (2) PG&E's claims to the contrary were false. Thus, applying its view of the law to that evidence, HART concludes PG&E has no standing because it did not own the transformer.

### B. Conclusions of Law

Based on the definitions and legal principles set forth in part I. of this opinion, we adopt the following conclusions. First, the general standing requirements set forth in Code of Civil Procedure section 367 apply to causes of action for negligence. Therefore, PG&E's standing to sue HART for negligence depends on whether PG&E is a real party in interest for purposes of Code of Civil Procedure section 367. Second, our determination of whether PG&E is a "real party in interest" will be based on an analysis of the various interests (i.e., rights, privileges, powers and immunities) PG&E held in relation to the transformer and is not limited to whether the label "owner" applies to PG&E. Third, PG&E will be regarded as a real party in interest if PG&E demonstrates

15.

(1) it holds interests that are concrete and actual and (2) it has suffered an injury of sufficient magnitude to assure the relevant facts and issues will be adequately presented in the lawsuit.

These conclusions provide the legal foundation for our analysis of HART's motion for summary adjudication because they define the facts that are "material" to the legal theory presented in the motion—namely, that PG&E lacked standing to sue for negligence. (See Code Civ. Proc., § 437c, subd. (c) [motion granted if there is no triable issue of material fact].)

C.     Legal Rules Governing Summary Adjudication

1.     *Standard of Review*

Appellate courts independently review the grant of a motion for summary adjudication. (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631.) Appellate courts performing this independent review apply the same three-step analysis as the trial court. (*Pierson v. Helmerich & Payne Internat. Drilling Co.* (2016) 4 Cal.App.5th 608, 617 (*Pierson*); *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1602 (*Brantley*).) The three-step analysis is used to determine whether a triable issue of material fact exists and whether the moving party is entitled to summary adjudication as a matter of law. (*Pierson, supra*, at pp. 616-618.)

2.     *Step One:  Framing the Issues*

The first step of the summary adjudication analysis requires the court to identify the issues framed by the pleadings. (*Pierson*, *supra*, 4 Cal.App.5th at p. 617.) Here, PG&E and MID alleged they were the owners of the transformer and HART negligently dropped a washer into the transformer, which made the transformer unusable and proximately caused damage. HART's motion for summary adjudication challenged PG&E's allegation that it was an owner of the transformer and presented the legal theory that PG&E lacked standing to sue HART for negligence.

16.

In general terms, HART's moving papers pass the first analytical step. The question of standing to bring a negligence claim is a question with the potential to be resolved by summary adjudication. (See *Williams v. Superior Court* (2017) 3 Cal.5th 531, 558-559 [lack of standing to bring claim under Labor Code may be raised in motion for summary judgment or summary adjudication]; *Two Jinn, Inc. v. Government Payment Service, Inc.* (2015) 233 Cal.App.4th 1321, 1337 [trial court correctly granted summary judgment on ground plaintiff lacked standing to bring an unfair competition claim].)

### 3. Step Two: HART's Burden

The second step of the summary adjudication analysis requires the court to determine whether the moving party carried its burden and made a prima facie showing justifying judgment in its favor. (*Brantley*, *supra*, 42 Cal.App.4th at p. 1602.) In broad terms, the prima facie showing is made when the "moving party has established facts justifying judgment in its favor." (*Pierson*, *supra*, 4 Cal.App.5th at p. 617.)

Stated in more detail, the party moving for summary judgment or adjudication bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) In the context of this case, HART bears the burden of persuasion that "[o]ne or more of the elements of the [negligence] cause of action cannot be separately established." (Code Civ. Proc., § 437c, subd. (o)(1); *Aguilar*, *supra*, at p. 850.) With respect to the presentation of evidence, the moving party "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra,* at p. 850.) The requisite prima facie showing "is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.)

How does a moving party carry its burden and make the requisite prima facie showing? The answer is by filing an adequate separate statement of undisputed material facts, along with sufficient evidence to establish the material facts. (*Pierson*, *supra*, 4

Cal.App.5th at p. 617; Code Civ. Proc., § 437c, subd. (b)(1) [separate statement].) The separate statement acts as the cornerstone for a moving party's prima facie showing of the nonexistence of any triable issue of material fact. When preparing the separate statement, a moving party defendant (1) should accurately identify the facts material to its legal theory as to why an essential element of the plaintiff's cause of action cannot be established; (2) actually include those material facts in the separate statement; and (3) reference evidence establishing, either directly or by inference, each material fact the moving party claims is undisputed. (*Pierson*, *supra*, at p. 617; see Cal. Rules of Court, rule 3.1350(d)(3).) In other words, when a defendant's separate statement omits material facts, the defendant fails to carry its burden of making a prima facie showing that a cause of action lacks merit. (*AMCO Ins. Co. v. All Solutions Ins. Agency, LLC* (2016) 244 Cal.App.4th 883, 904.)

### 4. Step Three: PG&E's Burden

If the moving party carries its initial burden, the court proceeds to the third step of the analysis. That step requires the court to determine whether the party opposing the motion has demonstrated the existence of a triable issue of material fact. (*Pierson*, *supra*, 4 Cal.App.5th at p. 618.)

### D. Analysis of Real Party in Interest

HART's motion attempted to establish PG&E lacked standing to sue. Consequently, we consider whether HART has carried its burden of establishing that PG&E is not a real party in interest for purposes of the negligence cause of action. Our analysis of this question begins by identifying PG&E's interests in the transformer and then determining if those interests (1) are concrete and actual and (2) have been injured in a sufficient magnitude to justify giving PG&E standing to sue for negligence. (See pt. I.C., *ante*.)

18.

## 1.    *Identification of Interests*

The 1964 power purchase contract between MID and PG&E transferred many interests to PG&E.  Some of those interests relate to the transformer.

Paragraph 7 of the 1964 power purchase contract states:  "M[ID] shall sell and deliver to P[G&E] during the term of this contract all the electric power and energy generated by the power plants of the *project*, except the power and energy delivered for *project power plant use*."  Thus, PG&E has the exclusive right to the benefits produced by the use of the transformer—specifically, electricity in voltages compatible with PG&E's two transmission systems.

PG&E also controls who operates the power plants because MID cannot transfer the power plants or the obligations under the contract without PG&E's approval.  Paragraph 12 of the 1964 power purchase contract states MID shall maintain and defend all "rights and privileges necessary or useful to the operation of the *project* and shall not voluntarily convey, transfer or in any manner encumber any of such rights without the written consent of [PG&E]."  Similarly, paragraph 18 states that the contract itself shall not be assigned voluntarily, except as security for MID's financing of the project, without the written consent of PG&E.

Appendix C-5 to the 1964 power purchase contract provides that if MID fails or is unable to operate or maintain the project or any units thereof (such as the transformer) in accordance with the contract, PG&E may upon reasonable notice to MID enter upon, operate and maintain the project or such unit as may be necessary, for and on behalf of MID, but at PG&E's own costs and expense.  Thus, PG&E has a conditional right to physical possession of the power plants or particular units.

PG&E also holds an interest in the transformer and the recovery of damages resulting from HART's negligent maintenance work because PG&E is contractually obligated to pay all the costs associated with the project.  This interpretation of the 1964 power purchase contract is supported by testimony from David Ward, a PG&E employee.

19.

During his deposition, Ward testified that PG&E was responsible for all costs associated with the operation and maintenance of the hydroelectric equipment at the Exchequer power plant.

## 2. PG&E's Interests Are Actual, Concrete and Substantial

We conclude PG&E's interest in all of the electric power and energy emitted by the transformer was actual and concrete. PG&E's right to receive the electricity was vested in the sense that it was "a completed, consummated right for present or future enjoyment; not contingent." (Black's Law Dict., *supra*, at p. 1595 [definition of "vested"].) PG&E had received electricity under the 1964 power purchase contract since the power plants began operations in 1967. Consequently, PG&E's right had been consummated and was not contingent upon an event that might (or might not) happen.

We also conclude PG&E's interests in receiving all of the electrical output of the transformer and its responsibility to pay the costs of operation and maintenance were substantial. The function and purpose of the power plants are to generate electricity. Therefore, the exclusive right to the electricity produced is one of the most important rights related to the power plants. The transformer is integral to the delivery of the electricity to PG&E. In other words, there would be little value in holding rights, privileges, powers and immunities in relation to the power plants and units such as the transformer, if the holder of such interests could not benefit from the plants' output of electricity.

The substantial nature of PG&E's interests is reinforced by its obligation to pay the cost of operation and maintenance. This obligation is sufficient to assure PG&E has a real interest in the ultimate adjudication of the negligence claim. In particular, the costs PG&E has incurred in connection with attempting to repair and then replacing the transformer, which PG&E contends are over $8.1 million, are of sufficient magnitude to reasonably assure that all of the relevant facts and issues will be adequately presented in

the litigation of the negligence claim.  (See *Schmier v. Supreme Court*, *supra*, 78 Cal.App.4th at p. 707.)

In summary, we conclude PG&E is a real party in interest under Code of Civil Procedure section 367 and has standing to sue HART for negligence.

E.     Analysis of HART's Arguments

The foregoing section sets forth our affirmative analysis for our conclusion that PG&E is a real party in interest with standing to sue for negligence.  In this section, we approach the issue from a different perspective and explain why some of the arguments presented by HART do not negate PG&E's standing.

1.     *Contractual Reference to the Sole Owner*

An important piece of evidence offered by HART to support its contention that MID is the sole owner of the transformer and, therefore, PG&E has no ownership interests is the sentence in the 1964 power purchase contract stating MID "shall be the sole owner (under Federal Power Commission License) of, the *project.*"  In our view, this statement does not conclusively establish PG&E holds no property interests in relation to the transformer—that is, holds no sticks from the bundle constituting the ownership interests in the transformer.  Furthermore, the statement does not conclusively establish PG&E holds insufficient *interests* to be a real party in *interest*.

First, the phrase "sole owner" was not drafted as an absolute statement, but was modified by the parenthetical "(under Federal Power Commission License)." Consequently, the sentence, on its face, is capable of being interpreted to mean MID shall be *listed on the federal license* as the sole owner.  HART has ignored the impact of the parenthetical modifier and, thus, has presented no argument or authority demonstrating the entity listed as the sole owner on the federal license must "have complete property in the thing" as that phrase is used in the definition of "owner."  (Black's Law Dict., *supra*, at p. 1137.)  In other words, being listed on the federal license as the sole owner might be

21.

a formality and is not necessarily definitive in every other legal contexts where questions of ownership may arise.

Second and most importantly, the 1964 power purchase contract must be read as a whole and other provisions in the contract unambiguously demonstrate MID has "parted with some interests in [the transformer]" as that phrase is used in the definition of "owner." (Black's Law Dict., *supra*, at p. 1137; see Civ. Code, § 1641 [contract must be read as a whole and, if reasonably practicable, each clause helping to interpret the other].) These other contractual provisions, such as the provision that transfers to PG&E the right to receive all the electricity produced by the power plants and transformed to the proper voltages, establish PG&E as "a person in whom one or more interests are vested." (Black's Law Dict., *supra*, at p. 1137 [definition of "owner"].) Thus, the evidence presented by HART supports a finding of ultimate fact that PG&E owns some property interests in the transformer despite the agreement to list MID as the sole owner on the federal license.

Third, the label "owner" is not determinative of the question whether PG&E is sufficiently interested in the adjudication of the negligence claim to qualify as a real party in interest under Code of Civil Procedure section 367. In other words, HART's focus on ownership has diverted it from the applicable legal test for standing—namely, whether PG&E qualifies as a real party in interest. (See pt. I.C., *ante* [tests for who is a real party in interest].)

### 2. *Deposition Testimony about Ownership*

David Ward, a PG&E employee, was asked during his deposition: "PG&E did not own the transformer that was removed from Exchequer, correct?" Ward answered, "Yes." Next, Ward was asked: "Is it your understanding that PG&E had any ownership interest in that transformer?" He answered, "No." As a follow-up question, he was asked: "Your understanding is [PG&E] did not have any ownership interest in that

22.

transformer, correct?" Ward replied, "Yes, that's correct." Earlier in the deposition, Ward agreed with the statement that "MID owned all of the equipment at Exchequer, including the transformer that was removed."

HART characterizes Ward's deposition testimony as an admission by PG&E that it does not own the transformer. HART argues the "sworn deposition testimony is binding upon PG&E for purposes of this motion."

We reject HART's contention that Ward's deposition testimony is a binding admission for purposes of the summary adjudication motion. First, the portions of Ward's deposition testimony in the appellate record do not explain what he understood the terms "own," "owned," and "ownership interest" to mean. As described earlier, the terms "property" and "owner" have a variety of meanings and we are unable to determine from the record what Ward's understanding was when he answered the deposition questions. For example, he might have meant the holder of legal title to the transformer or, alternatively, the entity designated as "owner" for purposes of the federal license. Based on the rule that a court must consider the evidence and all of the inference drawn from the evidence in the light most favorable to the party opposing summary judgment or adjudication (*Aguilar*, *supra*, 25 Cal.4th at p. 843), we cannot interpret Ward's testimony as a binding admission that PG&E held no property interests in the transformer at the time of the washer incident. Second, Ward's testimony about "ownership interests" is contradicted by the terms of the 1964 power purchase contract, which showed that PG&E held some property interests in the transformer. Therefore, Ward's deposition testimony does not establish that PG&E is not a real party in interest.

### 3. *Evidentiary Objections and Exclusion of PG&E's Evidence*

HART contends it met its initial burden of proving by admissible evidence that PG&E could not establish an element of its causes of action and, consequently, the burden shifted to PG&E to present admissible evidence that would allow a reasonable

trier of fact to find in his favor. HART further contends PG&E failed to carry its burden because the trial court sustained objections to the evidence presented by PG&E.

This argument is unavailing because we have concluded HART did not carry its initial burden of establishing PG&E was not a real party in interest. The evidence presented *by HART*—particularly the 1964 power purchase contract—showed that PG&E held some property interests in the transformer. Consequently, we have not reached the third step of the summary adjudication analysis and considered whether PG&E demonstrated the existence of a triable issue of material fact. (See pt. II.C.4., *ante*.)

### 4. *Homeowner Association Cases*

HART relies on cases involving homeowner associations to support its contention that a plaintiff asserting a negligence cause of action must plead and prove it owned the property at the time it was damaged. (See *Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024 (*Martin*); *Friendly Village Community Assn., Inc. v. Silva & Hill Constr. Co.* (1973) 31 Cal.App.3d 220 (*Friendly Village*).)

In *Friendly Village*, the court concluded a homeowner association lacked ownership, possession or right of possession in common areas of a condominium project and, therefore, lacked standing to sue grading contractors for failing to properly cut, fill and compact the soil underlying the project, which allegedly resulted in damage to the common areas. The court stated the following principle, which HART contends applies in this case: "An element of a cause of action for injury to real property is the plaintiff's ownership, lawful possession, or right to possession, of the property." (*Friendly Village, supra,* 31 Cal.App.3d at p. 224.) The project's declaration of covenants, conditions and restrictions required the homeowner association to repair the damaged common areas, but also required the association to assess each condominium owner his proportionate share of the costs. (*Id*. at p. 225.) The court concluded the condominium owners were the ones

24.

with standing to sue because they were required to bear the cost of repair. (*Ibid*.) The court then stated:

> "This conclusion is in accord with the rule that every action must be prosecuted in the name of the real party in interest. (Code Civ. Proc. § 367.) The condominium owners are the real parties in interest, because they are the ones having an actual and substantial interest in the subject matter of the action and who would be benefited or injured by the judgment in the action." (*Friendly Village*, *supra,* 31 Cal.App.3d at p. 225.)[11]

*Friendly Village* does not compel the conclusion that PG&E is not a real party in interest for purposes of the negligence cause of action. Instead, it supports the conclusion that parties who must pay for the damage done by the alleged negligence have a real interest in the litigation. Here, PG&E is the party that will bear financial responsibility for the damages if those damages are not recovered from HART. Consequently, PG&E is a real party in interest under the reasoning adopted in *Friendly Village*, *supra*, 31 Cal.App.3d at pages 224 through 225 because PG&E would benefit monetarily by a judgment against HART on the negligence cause of action.

In *Martin*, a husband and wife (the Martins) living in a house in a planned development community sued the homeowner association over a dispute involving a lot line agreement. (*Martin*, *supra*, 173 Cal.App.4th at p. 1029.) The Martins' seventh and eighth causes of action were for (1) negligence arising from an alleged duty the homeowner association owed the Martins as residents and members of the association to use reasonable care in maintaining the common areas and (2) negligence per se based on

---

[11]    The Legislature overturned the decision by enacting former Code of Civil Procedure section 374, which read, in part: "An owners' association established in a project consisting of condominiums, as defined in Section 783 of the Civil Code, ... shall have standing to sue as the real party in interest for any damages to commonly owned lots, parcels or areas ... occasioned by the acts or omissions of others, without joining with it the individual owners of such project." (Stats. 1976, ch. 595, § 2, p. 1439, amended by Stats. 1979, ch. 168, § 1, p. 387; see *Orange Grove Terrace Owners Assn. v. Bryant Properties, Inc.* (1986) 176 Cal.App.3d 1217, 1221–1222.)

25.

violations of the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350, et seq.). (*Martin*, *supra*, at p. 1029.) The homeowner association filed a demurrer, contending the owners of the home, but not the Martins, had standing to sue. (*Ibid*.) The trial court sustained the demurrer and the appellate court affirmed. (*Id*. at p. 1031.)

The appellate court rejected both negligence claims because the duty the Martins pleaded as being breached was the homeowner association's duty to maintain the common grounds. (*Martin*, *supra*, 173 Cal.App.4th at p. 1037.) The court concluded that particular duty arose out of the Davis-Stirling Common Interest Development Act and the covenants, conditions and restrictions—not out of common law principles of negligence. (*Martin, supra,* at p. 1037.) The court concluded that duty was owed only to members of homeowner association (i.e., the owners of the house). (*Ibid*.) As a result, the court concluded the Martins were not the real parties in interest and did not have standing to sue for negligence. (*Id*. at p. 1038.) The duty-based rationale set forth in *Martin* leads us to PG&E's arguments for why HART owed it a duty of care.

F.      Analysis of Duty of Care

The foregoing analysis focused on the interests of PG&E to determine whether PG&E was a real party in interest with standing to sue for negligence. An alternate version of the test for who is the "real party in interest" asks who holds the right sued upon by reason of the substantive law. (*Iglesia*, *supra*, 173 Cal.App.4th at p. 445; 4 Witkin, Cal. Procedure, *supra*, Pleading, § 121, p. 187 [person who has the right to sue under substantive law is the real party in interest].)

Here, PG&E contends it has standing to bring a negligence claim because HART owed it a duty of care. PG&E refers to the following statement by the California Supreme Court in *Biakanja, supra,* 49 Cal.2d 647, which provides guidance for courts making the policy determination as to whether a duty of care exists in a particular case:

"The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." (*Id*. at p. 650.)

PG&E argues that applying the *Biakanja* factors to the evidence presented shows there are triable issues of material fact concerning whether HART owed PG&E a duty of care.

HART's moving papers were not tailored to the duty-of-care element of a negligence cause of action. As a result, the moving papers did not present all of the material facts needed to balance the *Biakanja* factors and determine whether HART owed PG&E a duty of care. Consequently, we cannot affirm the grant of summary adjudication of the negligence cause of action on the ground HART demonstrated it owed PG&E no duty of care.

## III.    RECOVERY UNDER SECTION 7952

The trial court concluded PG&E could not establish any entitlement to the measure of damages set forth in section 7952 because PG&E could not prove it was the owner of the transformer. HART supports the court's conclusion by arguing the statutory phrase "equipment of any … electrical … corporation" should be interpreted to mean equipment *owned by* the electrical corporation and, because the undisputed evidence shows MID was the sole owner of the transformer, PG&E cannot recover damages under section 7952. PG&E disagrees with HART's statutory interpretation, contending a proper interpretation must promote, rather than defeat, the purpose of the statute— namely, allowing public utilities to recover an enhanced measure of damages from tortfeasors and thereby preventing those costs from being passed to the general public.

27.

A.    Statutory Construction

Our Supreme Court's approach to the judicial interpretation of California statutes is well established.  (*People v. Castillolopez* (2016) 63 Cal.4th 322, 329.)  A court's "'role in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law.'"  (*Ibid.*)  Courts "'look first at the words themselves, giving them their usual and ordinary meaning'" because statutory language generally is the most reliable indicator of that intent.  (*Ibid.*)

1.    *Statutory Language With a Plain Meaning*

When the statutory language, standing alone, is clear and unambiguous, courts usually adopt the plain or literal meaning of that language.  (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 (*Lungren*).)  In this context, *ambiguous* means susceptible to more than one reasonable interpretation.  (*Honchariw v. County of Stanislaus* (2013) 218 Cal.App.4th 1019, 1027.)

The plain meaning of the words of a statute may be disregarded only when the application of their literal meaning would (1) frustrate the manifest purposes that appear from the provisions of the legislation when considered as a whole in light of its legislative history or (2) produce absurd consequences that the Legislature clearly did not intend.  (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 979 [literal construction will not control when it frustrates manifest purpose of enactment as a whole]; *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [statutory language should not be given literal meaning if it results in absurd consequences].)

2.    *Ambiguous Statutory Language*

Whether statutory language is ambiguous is a question of law subject to independent review on appeal.  (*Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership* (2015) 238 Cal.App.4th 370, 381 (*Wells Fargo*).)  When statutory language is susceptible to more than one reasonable interpretation, courts must select the

construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute. (*Ibid.*) The apparent intent of the Legislature is determined by reading the ambiguous language in light of the statutory scheme rather than reading it in isolation. (*Lungren*, *supra*, 45 Cal.3d at p. 735.) Stated another way, the ambiguous language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. (*Ibid.*) In addition, courts determine the apparent intent underlying ambiguous statutory language by evaluating a variety of extrinsic aids, including the ostensible objects to be achieved by the statute, the evils to be remedied, public policy, and the statute's legislative history. (*Wells Fargo*, *supra*, at p. 381.)

B.      Statutory Text

Part of the historical context for the question of statutory interpretation presented in this appeal is established by the initial version of section 7952, which was enacted in 1951 and stated the following:

> "Any person who injures or destroys, through want of proper care, any necessary or useful *fixture of any* telegraph or telephone or *electric power corporation* or the pipe line, valves or fittings of any gas corporation, is liable to the corporation for *all damages* sustained thereby. Any vessel which, by dragging its anchor, or otherwise, breaks, injures, or destroys the subaqueous cable of a telegraph or telephone or electric power corporation or the pipe line of a gas corporation, subjects *its owner* to liability for the damages sustained thereby." (Stats. 1951, ch. 764, § 7952, p. 2195, italics added.)

The Legislature did not explain the meaning of the phrase "all damages." For instance, it did not define "damages" or specify particular items that could be recovered. In 1969, the Legislature amended section 7952 by (1) adding a provision defining the proper measure of damages; (2) changing the word "fixture" to the phrase "facility or equipment;" and (3) making other minor changes. As a result of the 1969 amendment, section 7952 now provides in full:

"Any person who injures or destroys, through want of proper care, any necessary or useful facility or *equipment of any* telegraph, telephone, *electrical*, or gas *corporation*, is liable to the corporation for all damages sustained thereby. The *measure of damages* to the facility or equipment injured or destroyed shall be the *cost to repair or replace the property injured* or destroyed including direct and allocated costs for labor, materials, supervision, supplies, tools, taxes, transportation, administrative and general expense and other indirect or overhead expenses, less credit, if any, for salvage, as determined by such telegraph, telephone, electrical or gas corporations in conformity with a system of accounts established by the commission. The specifying of the measure of damages for the facility or equipment shall not preclude the recovery of such other damages occasioned thereby as may be authorized by law.

"Any vessel which, by dragging its anchor, or otherwise, breaks, injures or destroys any underwater cable of a telegraph, telephone or electrical corporation or pipeline of a gas corporation, subjects *its owner* to liability for the damages sustained thereby." (Stats. 1969, ch. 709, § 1, pp. 1389–1390, italics added.)

Accordingly, after the 1969 amendment, section 7952 contained "the measure of damages for damage done to a facility of a telegraph, telephone, electric or gas corporation." (Legis. Counsel's Dig., Sen. Bill No. 939, 2 Stats. 1969 (Reg. Sess.) Summary Dig., p. 102.) The statute does not define what the preposition "of" means in the phrase "equipment of any … electrical … corporation." (§ 7952.) For instance, it does not state the phrase refers to equipment (1) *owned by*, (2) *physically possessed by*, or (3) *associated or connected with*, the electrical corporation. Consequently, even if the phrase was intended to refer to ownership, the statute does not identify whether that ownership must be sole and complete ownership or partial ownership—that is, control over some, but not all, of the sticks in the bundle of interests that constitute "property." (See pt. I.A., *ante*.)

C.      Legislative History

We granted PG&E's unopposed request for judicial notice of documents compiled by LRI History LLC that relate to the 1969 amendment of section 7952. Consistent with the positions taken by the parties, we consider all of the documents compiled and

30.

presented.  As noted by HART, the legislative materials before this court do not include documents relating to the initial version of section 7952.

An unitemized document in the Governor's chapter bill file on Senate Bill No. 939 (1969 Reg. Sess.) described the reasons for amending section 7952 as follows:

> "The Public Utilities Code presently establishes liability for 'all damage' to equipment *owned by utilities,* but does not define 'damages'.  Such definition is necessary because of the direct interest the consuming public has in the recovery of this type [of] damage.

> "Since the service is so highly specialized, the utilities can most economically and most effectively restore service to the public by repairing the damage to *their own system.*  In repairing *their own systems*, utilities incur certain indirect costs.  [¶] … [¶]

> "If the utility, and more importantly, the consuming public, is to be made whole for the cost of repairing such damage, the party causing the damage must be required to pay not only the direct cost, but also the indirect cost of making these repairs.  Any indirect costs not recovered from the wrong doer must be recovered through rates charged to utility customers.

> "The absence of a statutory definition of damages to utility property where the repair work is performed by utility forces has resulted in a great deal of litigation which could be avoided.

> "Justice, equity and common sense require this amendment in order to define the measure of damage *to a utility's property* and to prevent needless and expensive litigation which must be paid for by the utility and therefore, the consuming public."  (Italics added.)

The enrolled bill memorandum to the Governor, dated August 7, 1969, for Senate Bill No. 939 stated, "The bill was sponsored by Southern California Edison Company.  It is intended to more clearly define 'damages' by including indirect charges."

D.      Analysis of Meaning

      1.     *Contentions About the Word "Of"*

The statutory interpretation adopted by the trial court and HART is based on the meaning of the word "of" as it appears in the phrase "equipment of any … electrical corporation."[12] (§ 7952.) HART supports this interpretation by arguing:

> "The word 'of' and the phrase 'facility or equipment of … a [*sic*] corporation' are ordinary words and phrases. The word 'of" connotes ownership and belonging to. In common usage, the phrase 'property of' connotes property which is owned by a particular individual or entity. PG&E had no ownership interest in the Exchequer Transformer and had no right to ownership of the transformer, now or in the future."

PG&E argues HART's interpretation rewrites the statutory text by replacing the word "of" with the phrase "owned by," which does not appear in the relevant portion of the statute. PG&E further argues the meaning of section 7952 "may not be determined from a single word" (*Lungren*, *supra*, 45 Cal.3d at p. 735) but should promote the purpose of the statute.

      2.     *Is "Of" Ambiguous?*

Whether the word *of* and the phrase *of any electrical corporation* are ambiguous—that is, reasonably susceptible to more than one meaning—presents a question of law. (*Wells Fargo*, *supra*, 238 Cal.App.4th at p. 381.) As explained below, we conclude the word "of" and, therefore, the phrase in which it was used are ambiguous.

First, we note HART has not supported its argument about the meaning of the word "of" with a citation to any legal authority or dictionary definitions.[13] (See Cal.

---

[12] As to the other words in this phrase, we conclude (1) the transformer was "equipment" for purposes of section 7952 and (2) PG&E is an electrical corporation. The latter conclusion is based on cases in which PG&E was allowed to recover damages under section 7952 and on certain statutory definitions. (See *Pacific Gas & Electric Co. v. Alexander* (1979) 90 Cal.App.3d 253 [damage to wood utility poles]; *Pacific Gas & Electric Co. v. Mounteer* (1977) 66 Cal.App.3d 809; §§ 204 [corporation], 205 [person], 206 [person, corporation], 218 [electrical corporation].)

Rules of Court, rule 8.204(a)(1)(B) [brief must support each point by argument and, if possible, by citation of authority].) Thus, HART's approach implies HART thought it was not possible to cite authority supporting its argument about plain meaning.

Second, the California Supreme Court has addressed the meaning of the preposition "of" when it appears in a statute. (See *People v. Hallner* (1954) 43 Cal.2d 715, 718 (*Hallner*); *Harlan v. Industrial Acc. Com.* (1924) 194 Cal. 352, 361 (*Harlan*).) In both cases, the court considered whether to interpret "of" as a word of proprietorship or possession (which is interpretation advocated by HART) and rejected that interpretation.

In *Hallner*, *supra*, 43 Cal.2d 715, the dispute involved a statute making it a crime to offer a bribe to any "'executive officer of this state.'" (*Id*. at p. 717.) The question presented was whether the phrase "of this state" covered an executive officer *of a city*. (*Ibid*.) Our Supreme Court stated "the word 'of' has different meanings" and illustrated the point by stating it could be "used in its possessive sense or to indicate geographic location." (*Id*. at p. 718.) In the context of the bribery statute, the court concluded "of the state" meant "in the state." (*Id*. at p. 721.) As a result, the court interpreted the statute to prohibit offering a bribe to an executive officer of a city. (*Ibid*.) Thus, *Hallner* illustrates that the preposition "of" is susceptible to more than one interpretation and rejects interpreting "of" in its possessive sense.

In *Harlan*, *supra*, 194 Cal. 352, the dispute involved a workers' compensation statute that limited dependents entitled to death benefits to persons who were "'in good faith a member of the family or household *of* [the deceased] employee.'" (*Id*. at p. 355,

---

**13**     "Courts frequently consult dictionaries to determine the usual meaning of words." (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 16.) "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122.)

italics added.)  The deceased employee was an illegitimate minor, and the applicant for benefits was the aunt who had raised him as the twin of her own son, who was nearly the same age.  (*Id*. at pp. 357-358.)  The court addressed "the effect to be given to the words 'of [the deceased] employee' as used" in the statute.  (*Id*. at p. 360.)  In particular, the court considered whether "the applicant [must be] a member of the family or household of which said deceased employee *was the head or master*."  (*Id*. at p. 361, italics added.)  The court rejected this interpretation, stating:

> "Such a restricted construction would tend to defeat rather than to promote the purpose of the act.  We think that petitioner has lost sight of the object and purpose of the law.  It is not to be doubted that the words 'of such employee' are words of identification and relation rather than words of proprietorship or possession within the contemplation of the act.  In this connection the preposition 'of' is very commonly used and has a meaning well understood.  The Standard Dictionary thus defines it: '(1) associated or connected with, usually in some causal relation, efficient, material, formal or final.'  It will be noted that the act does not employ the term 'head of the family' for the reason, doubtless, that the head of the family or person who by common consent exercises authoritative domestic control may not, in fact, be a bread-winner at all, but in many cases a dependent.  The act cares for the support of dependents, and does not concern itself with the real or nominal heads of families or households except so far as that station may have a causal relation to the support of dependents of the household."  (*Ibid*.)

This quote shows our Supreme Court considered interpreting "of" as a word of proprietorship or possession and rejected that statutory construction.  As a result, *Harlan* demonstrates that the preposition "of" is not always interpreted as designating a proprietary relationship and, therefore, is susceptible to more than one interpretation.

Third, the possibility that the preposition "of" is susceptible to more than one interpretation is supported by the multiple definitions set forth in Black's Law Dictionary (4th rev. ed. 1968) at page 1232:

> "A term denoting that from which anything proceeds; indicating origin, source, descent, and the like; as he is of a race of kings; he is of noble

blood. [Citation.] Associated with or connected with, usually in some casual relation, efficient, material, formal, or final. [Citation.]

"The word has been held equivalent to after, [citation]; at, or belonging to, [citation]; in possession of, [citations]; manufactured by, [citation]; residing at, [citation]; from, [citation]; in [citation]."[14]

The case law and dictionary definition establish that, in the abstract, the preposition "of" can be defined in many ways. Therefore, our next step in resolving whether the word "of" *as used in section 7952* is ambiguous places the word in the context of the rest of the statutory language and determines whether, in that context, it is reasonable to interpret the word in more than one way. We conclude more than one interpretation is reasonably possible because "of" could be interpreted broadly to mean associated or connected with (*Harlan*, *supra*, 194 Cal. at p. 361) or, alternatively, it could be interpreted more restrictively to mean belonging to or owned by (see *Poe v. Seaborn* (1930) 282 U.S. 101, 109 [in federal revenue statute taxing the net income of every individual, "use of the word 'of' denotes ownership"]).

### *3.      Resolving the Ambiguity*

When resolving the meaning of ambiguous statutory language, courts (1) select the construction that most closely comports with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute and (2) avoid interpretations that lead to absurd consequences. (*Wells Fargo*, *supra*, 238 Cal.App.4th

---

**14** Following the example of our Supreme Court, we cite this version of Black's Law Dictionary because it is the edition that was current when the legislation in question was enacted. (See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 570, fn. 4 [cite to the 1968 revised edition of Black's Law Dict.].) Various editions of Black's Law Dictionary has been referred to in federal cases for a definition of "of." (See *American Soda, LLP v. U.S. Filter Wastewater Group, Inc.* (10th Cir. 2005) 428 F.3d 921, 926, fn. 1; *Dixon v. TSE International Inc.* (5th Cir. 2003) 330 F.3d 396, 397-398; *Shaw v. Dawson Geophysical Co.* (S.D.W.Va. 2009) 657 F.Supp.2d 740, 748.

As to the many definitions for the preposition "of," Webster's Third New International Dictionary (1986) at page 1565 lists 20 definitions including "relating to" and "used as a function word indicating a possessive relationship."

at p. 381.)  In other words, courts adopt the interpretation that *best effectuates* the legislative intent or purpose.  (*Beal Bank, SSB v. Arter & Hadden, LLP* (2007) 42 Cal.4th 503, 508.)  In reaching a conclusion about which interpretation best effectuates the legislative intent or purpose, courts may consider a variety of extrinsic sources, including the legislative history.  (*Ibid.*)  The legislative history might provide insight into the ostensible objects to be achieved by the statute, such as remedying a particular evil, and the public policy underlying the statute.  (*Wells Fargo*, *supra*, at p. 381.)

### 4. *Apparent Intent of the Legislature*

The materials in the legislative history do not explicitly state section 7952's phrase "equipment of any … electrical … corporation" means equipment owned in whole or in part by the corporation.  However, the materials restate the statutory text and some of the restatements support inferences about what the Legislature intended the preposition "of" to mean.  The unitemized document quoted in part III.C., *ante*, refers to (1) "equipment owned by utilities"; (2) "damage to their own system"; and (3) "the measure of damage to a utility's property."  The document includes the sentence: "In repairing *their own systems*, utilities incur certain indirect costs."  (Italics added.)  These references support the inference that the preposition "of" was used to mean owned by—that is, to designate an ownership or proprietary interest in the equipment.  However, this inference about the apparent intent of the Legislature does not bring us to the end of our inquiry.  The inference leaves open the specific question of whether the corporation's ownership must be sole (i.e., complete) ownership or extends to partial ownership.

### 5. *Promoting the Legislative Purpose*

The absence of statutory text or legislative materials that directly or indirectly address the sole or partial ownership question leads us to consider which interpretation best effectuates the legislative purpose.  The legislative materials identify that purpose as requiring the person causing the damages to pay the direct and indirect costs of repair and

thereby preventing those costs from being "recovered through rates charged to utility customers." PG&E agrees with this assessment of the legislative materials. Its opening brief argued the purpose of section 7952 "is to allow public utilities such as PG&E to more easily recover damages from tortfeasors and avoid passing those costs onto the general public." In contrast, HART's appellate brief focuses on the statutory text and does not address how the legislative purpose relates to the possibility of partial ownership.

We conclude the legislative purpose of protecting consumers from paying increased utility rates to cover damages caused by the want of care of third parties is best effectuated by interpreting "of" so that it is not limited to complete ownership of the facility or equipment in question. Direct and indirect costs incurred by a utility in its capacity as a partial owner have the *potential* to be passed through to consumers in the rates charged. Therefore, categorically limiting recovery to utilities that are the sole owner of the damaged equipment would not best effectuate the purpose of section 7952.

Based on the statutory purpose, we conclude the statutory phrase "equipment of any … electrical … corporation" encompasses equipment solely owned by the corporation and some equipment partially owned by the corporation. To fall within the statutory phrase, partially owned equipment must met the following conditions: (1) the property interests held by the corporation must be substantial, not trivial; (2) the corporation must incur actual liability for direct or indirect expenses (or both) in repairing or replacing the damaged equipment; and (3) a substantial portion of those expenses have been passed, are being passed, or are reasonably likely to be passed, along to consumers.[15] These conditions assure the recovery allowed a partial owner is aligned with the legislative purpose underlying the statute.

---

[15] Restating this last element from another perspective, if the economic impact of the expenses incurred to repair or replace the equipment is a reduction of the corporation's

E.    Applying the Statutory Interpretation to HART's Moving Papers

HART's motion for summary adjudication of PG&E's cause of action under section 7952 was based on the legal theory that MID was the sole owner of the transformer and PG&E did not own the transformer. HART's legal theory used an overly restrictive interpretation of section 7952 and did not address PG&E's ownership of some interests regarded as property under California law. Although HART's moving papers established PG&E was not the sole owner of the transformer, HART's showing did not eliminate the possibility that PG&E could prove it was a partial owner satisfying the three conditions identified earlier in this opinion. As a result of HART's failure to carry its burden, we need not proceed to the third step of the summary adjudication analysis and examine whether PG&E's opposition papers have demonstrated the existence of a triable issue of material fact. (See *Pierson*, *supra*, 4 Cal.App.5th at p. 618.)

In summary, HART has not carried its burden of demonstrating grounds that completely dispose of PG&E's cause of action for damages under section 7952. (See Code Civ. Proc., § 437c, subd. (f)(1).) Accordingly, that cause of action should not have been summarily adjudicated.

## DISPOSITION

The judgment is reversed. The trial court is directed (1) to vacate the part of its October 2015 order granting defendant's motion for summary adjudication as to PG&E's causes of action for negligence and for damages under section 7952 and (2) to enter a new order denying summary adjudication as to those causes of action.

profits, then recovery under the statute is not authorized because the purpose of the statute is not the protection of shareholder or investor profits.

For purposes of the further proceedings to be conducted on remand, we note the three conditions are not necessarily the final and binding interpretation of section 7952. The trial court shall have the flexibility to modify these conditions if (1) legislative history relating to the 1951 enactment of section 7952 is presented on remand and (2) the materials in that legislative history justify a modification by showing a different "apparent intent" or a broader set of legislative purposes.

PG&E shall recover its costs on appeal.

_____
FRANSON, Acting P.J.

WE CONCUR:


_____
SMITH, J.


_____
MEEHAN, J.